STATE OF NORTH CAROLINA v. ELIAS HANNA SYRIANI

No. 300A91

(Filed 12 March 1993)

**1. Jury § 227 (NCI4th)— capital trial—death penalty views of prospective juror—equivocal responses—excusal for cause**

The trial court in a capital trial did not err in excusing a prospective juror for cause because of his views on the death penalty where he gave equivocal and conflicting responses to questions by the trial court and the prosecutor, but those responses nonetheless revealed that he did not believe in the death penalty, he thought his views on the death penalty would interfere with the performance of his duties at both the guilt and sentencing phases of the trial, and he could not affirmatively agree to follow the law in carrying out his duties as a juror.

**Am Jur 2d, Jury § 290.**

**Beliefs regarding capital punishment as disqualifying juror in capital case—post-Witherspoon cases. 39 ALR3d 550.**

**2. Jury § 133 (NCI4th)— voir dire—expectation of conviction—objection sustained—similar questions allowed—absence of prejudice**

The trial court did not abuse its discretion in refusing to allow defendant to ask the first twelve prospective jurors passed by the State in a murder trial whether any of them had any expectation that defendant was going to be proven guilty where the court sustained an objection to the form of the question and immediately allowed defendant to ask two almost identical questions.

**Am Jur 2d, Jury § 304.**

**3. Jury § 133 (NCI4th)— voir dire—guilty because charged—objection sustained—absence of prejudice**

Defendant failed to show an abuse of discretion or prejudice when the trial court sustained the State's objection to a question as to whether any member of the second panel of jurors passed by the State felt that, because defendant was charged with a crime, he may be guilty of something where defendant then reminded the jurors about the presumption of innocence and asked whether they all still agreed with

that presumption; prior to questioning by either the prosecutor or defense counsel, the court had carefully instructed these jurors that the fact that defendant was charged was not evidence of guilt and had instructed on the presumption of innocence and the State's burden of proving guilt; and defendant individually questioned each juror on this informed panel and was able to pursue the relevant inquiry as to whether any prospective juror had formed an opinion on defendant's guilt or innocence based solely on the charge before the court.

**Am Jur 2d, Jury § 304.**

4. **Jury § 127 (NCI4th) — voir dire — strength of juror's opinions — objection sustained — absence of prejudice**

Defendant failed to show an abuse of discretion or prejudice when the trial court sustained the State's objection to a question as to whether a prospective juror has pretty strong opinions and sticks to them or is easily swayed where the court permitted defense counsel to ask the juror whether she could deliberate with others, which was the crux of the question; defendant asked the juror numerous personal questions designed to determine whether she had formed an opinion as to defendant's guilt and whether she could be fair and impartial; and defendant had not exhausted his peremptory challenges and was therefore not forced to accept a juror objectionable to him. If defendant wanted to determine how well the juror could stand up to other jurors in the event of a split decision, the question amounted to an impermissible stake-out.

**Am Jur 2d, Jury § 304.**

5. **Evidence and Witnesses §§ 335, 339 (NCI4th) — misconduct toward victim — admissibility to show lack of accident, intent, premeditation and deliberation**

In a prosecution of defendant for the first degree murder of his wife, testimony by defendant's children about defendant's frequent arguments with, violent acts toward, separations from, reconciliations with, and threats to his wife were admissible under Rule of Evidence 404(b) to prove lack of accident, intent, malice, premeditation and deliberation, notwithstanding that some of the incidents dated back to the beginning of the marriage.

STATE v. SYRIANI

[333 N.C. 350 (1993)]

Am Jur 2d, Evidence § 298; Federal Rules of Evidence §§ 117, 119, 120, 124.

Admissibility under Rule 404(b) of Federal Rules of Evidence, of evidence of other crimes, wrongs or acts similar to the offense charged. 41 ALR Fed. 497.

6. **Appeal and Error § 504 (NCI4th); Evidence and Witnesses § 765 (NCI4th)— defendant's misconduct toward daughter— invited error—opening door to testimony**

In a prosecution of defendant for the first degree murder of his wife wherein defense counsel asked defendant's daughter on cross-examination why she so disliked her father and whether he had ever beaten her, the daughter's response about an occasion when defendant had beaten her was invited error, and defendant cannot complain of such error on appeal. Furthermore, this question opened the door to redirect testimony by the daughter about another specific act of misconduct toward her by defendant to explain her response as to why she so disliked her father, which went directly to her credibility, and to rebut the implication that her father had beaten her only the one time.

Am Jur 2d, Appeal and Error § 717.

7. **Criminal Law § 1315 (NCI4th)— capital trial—sentencing hearing—evidence of nonviolent character—rebuttal testimony—specific instances of misconduct**

Where a defendant on trial for first degree murder of his wife presented evidence during the sentencing phase of his character for nonviolence and requested submission of the statutory mitigating circumstance that he had no significant history of prior criminal activity, the State was entitled to impeach him with the rebuttal testimony of his daughter concerning four specific instances of misconduct by defendant toward her mother and herself.

Am Jur 2d, Criminal Law § 527.

8. **Evidence and Witnesses §§ 335, 339 (NCI4th)— cross-examination of defendant—specific and general misconduct—proper purpose**

In a prosecution of defendant for the first degree murder of his wife, the State's cross-examination of defendant with regard to defendant's specific and general misconduct toward

his wife was proper under Rule of Evidence 404(b) where the State proffered the evidence to establish lack of accident, intent, malice, premeditation and deliberation, not to prove that defendant acted in conformity with a violent character.

**Am Jur 2d, Evidence § 298; Federal Rules of Evidence §§ 117, 119, 120, 124.**

9. **Evidence and Witnesses §§ 765, 3023 (NCI4th)— impeachment — specific instances of misconduct — opening door to cross-examination**

While Rule of Evidence 608(b) prohibits use of specific instances of misconduct to impeach a defendant upon cross-examination, a defendant on trial for the first degree murder of his wife opened the door to cross-examination regarding specific instances of misconduct toward both his wife and children when he testified on direct examination that he was a loving and supportive husband and father, and that he did not intend to hurt his wife but unintentionally, or in self-defense, struck back at her with a screwdriver, trying only to get her to stop moving her car. Therefore, the State was properly permitted to cross-examine defendant about threats, arguments, and acts of violence toward both his wife and children to explain and rebut defendant's direct examination testimony. Furthermore, the trial court did not err by failing to exclude this evidence as more prejudicial than probative under Rule of Evidence 403.

**Am Jur 2d, Witnesses § 968.**

10. **Evidence and Witnesses § 268 (NCI4th) — character in issue — cross-examination — specific instances of misconduct**

Where defendant put his character in issue by having one witness testify about his reputation for peacefulness and another testify that defendant was not the kind of person he would expect to kill his wife and that there was nothing in defendant's lifestyle that caused him any concern, the prosecutor was properly permitted to cross-examine these witnesses about specific instances of misconduct by defendant toward his wife and children, in accordance with Rules of Evidence 404(a) and 405(a), to rebut their prior testimony.

**Am Jur 2d, Witnesses § 968.**

STATE v. SYRIANI

[333 N.C. 350 (1993)]

11. **Evidence and Witnesses §§ 1694, 1700 (NCI4th) — photographs of victim's body — not excessive — no improper presentation to jury**

The trial court did not abuse its discretion in the admission of sixteen color photographs of a murder victim's body where six photographs depicted the victim shortly after her arrival at the hospital, intubated, connected to a ventilator, and covered with white hospital sheets; the trial court limited the jury's consideration of these photographs to illustration of the testimony of a neighbor who came to the victim's aid; the photographs served properly to illustrate the neighbor's testimony about the nature of the wounds and the prolonged manner of the killing; ten photographs were submitted in conjunction with a pathologist's testimony about the autopsy; nine of these depicted isolated areas of injury to the victim's hands, arms, elbows, neck, mouth, and head, and one depicted a section of the membrane between the victim's brain and skull; although gruesome, these photographs were not excessive, unduly repetitious, or duplicative of the six hospital photographs because the victim survived almost one month and many of the wounds had healed; these photographs were also tendered with limiting instructions that they were only for the purpose of illustrating the pathologist's testimony; and they served to illustrate the pathologist's testimony regarding the likely weapon, which had never been found, the multiple stab wounds, and the cause of death. Furthermore, the manner of presentation of the photographs to the jury was not improper where the autopsy photographs were passed to the jury at the close of the pathologist's testimony and the others at the close of the neighbor's testimony, and the photographs were published again only at the conclusion of the evidence with all exhibits.

**Am Jur 2d, Evidence §§ 256, 785.**

12. **Homicide § 250 (NCI4th) — first degree murder — sufficient evidence of premeditation and deliberation**

There was sufficient evidence that defendant killed his wife with malice, premeditation and deliberation to support his conviction of first degree murder where the State's evidence tended to show that defendant had a history of physically abusing his wife and children; when he first learned that his wife wanted a divorce, he threatened to kill her and ruin

the lives of the children if she ever left him; approximately two weeks before he killed his wife, she had obtained a domestic violence order against him, requiring him to leave the home; on the night of the murder, defendant parked along the street where his wife and children lived; as his wife's car approached the street, defendant pulled his van in front of her car, forcing her to stop; defendant approached the car, opened the door, stabbed her with a screwdriver, and as she moved her car out of the road, continued to stab her; defendant stabbed his wife a total of twenty-eight times with a screwdriver, including one blow which penetrated the brain three inches and another that fractured her jaw; and following the incident, defendant walked calmly back to his van and drove to a nearby fire station for treatment of scratches he had received.

**Am Jur 2d, Evidence § 363.**

**Homicide: presumption of deliberation from the fact of killing. 86 ALR2d 656.**

13. **Criminal Law § 1343 (NCI4th) — first degree murder — especially heinous, atrocious, or cruel aggravating circumstance — constitutional instructions**

The trial court's Pattern Jury Instructions on the "especially heinous, atrocious, or cruel" aggravating circumstance provided constitutionally sufficient guidelines to the jury where the instructions permitted a finding of this circumstance when the brutality involved in the murder exceeded that which is normally present in any killing or the murder was a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

**Am Jur 2d, Trial § 1120.**

14. **Criminal Law § 1345 (NCI4th) — first degree murder — especially heinous, atrocious, or cruel aggravating circumstance — evidence sufficient to support finding**

The trial court did not err in submitting the aggravating circumstance that defendant's first degree murder of his wife was "especially heinous, atrocious, or cruel" because the evidence and inferences therefrom supported a finding that the level of brutality exceeded that normally found in first degree murder cases and that the killing was physically and psychologically agonizing, conscienceless, pitiless and unnecessarily torturous

to the victim. The jury could reasonably find that the victim sustained and endured agonizing physical pain before becoming unconscious or comatose and that the killing was excessively brutal and conscienceless, pitiless and unnecessarily torturous based upon evidence that defendant stabbed the victim twenty-eight times; while many of the wounds were to her face and neck, several were to her arms and hands, suggesting that she tried to defend herself or ward off the blows; one wound penetrated the brain three inches, causing hemorrhaging and swelling in the brain; another blow fractured her jaw and several of her teeth; these blows did not cause immediate death, and the victim was able to communicate with her daughter moments after the attack and with the attending emergency room assistant upon her arrival at the hospital; and she died twenty-eight days later as a result of the puncture wound to her brain after having suffered stroke, infarct or paralysis. Additionally, where there was evidence that defendant had abused his wife to the extent that she had left the home with the children and that two weeks prior to the killing she had a domestic violence order served on defendant, requiring him to leave their home, the jury could reasonably infer that the victim feared her husband and endured psychological torment during the attack, not only because of danger to her own life but also to the life of her son, who tried to stop his father's attack.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstances that murder was heinous, cruel, depraved, or the like — post-Gregg cases. 63 ALR4th 478.**

15. **Criminal Law § 1360 (NCI4th) — impaired capacity mitigating circumstance — testimony by defendant — judgment affected by emotional disturbance — insufficient evidence**

The trial court was not required to submit *sua sponte* the impaired capacity mitigating circumstance to the jury in a prosecution of defendant for the first degree murder of his wife based upon defendant's testimony that he was very upset about the prospect of losing his wife and family through divorce proceedings, that he was "very emotional and highly upset" when he approached his wife on the night of the killing, that

he was having a lot of hurt inside, and that those feelings were affecting his judgment. N.C.G.S. § 15A-2000(f)(6).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.**

16. **Criminal Law § 1320 (NCI4th) — capital trial — penalty phase — consideration of bad acts evidence — instruction not required**

The trial court did not err in failing to instruct the jury at the penalty phase of a capital trial that prior bad acts evidence received at the guilt phase, as well as on rebuttal in the penalty phase, could not be used by the jury to support an aggravating circumstance in the penalty phase where the evidence of bad acts toward the victim was relevant to the existence of the "especially heinous, atrocious, or cruel" aggravating circumstance, the only aggravating circumstance submitted to the jury, because it tended to show that the victim feared defendant and endured psychological torment during the attack, not only on account of the danger to her own life but also to the life of her son, who tried to stop defendant's attack on her. N.C.G.S. § 15A-2000(a)(3).

**Am Jur 2d, Evidence § 298.**

17. **Criminal Law § 455 (NCI4th) — death penalty — specific deterrence jury argument**

The trial court did not commit plain error in failing to instruct the jury *ex mero motu* to disregard the prosecutor's argument to the jury that "[t]he only way to insure he won't kill again is the death penalty," since specific deterrence arguments are proper.

**Am Jur 2d, Trial § 572.**

**Propriety, under federal Constitution, of evidence or argument concerning deterrent effect of death penalty. 78 ALR Fed. 553.**

18. **Criminal Law § 460 (NCI4th) — murder of wife — intent to kill daughter — jury arguments — reasonable inferences from evidence**

The prosecutor's jury arguments in a prosecution for the murder of defendant's wife that the victim told her daughter

who came to her aid to "shut up" because she feared defendant would kill the daughter if he heard her, that defendant stopped his van and started back toward the victim in order to kill the daughter, and that he did not do so only because a citizen came to the victim's aid were reasonable inferences based on the evidence and were within the wide latitude given counsel in argument.

**Am Jur 2d, Trial § 632.**

19. **Criminal Law § 1373 (NCI4th) — first degree murder of wife — death penalty not excessive or disproportionate**

A sentence of death imposed on defendant for the first degree murder of his wife is not excessive or disproportionate, considering both the crime and the defendant, where the murder was preceded by many years of physical abuse of the wife and threats to her; the victim feared defendant; the murder resulted from a calculated plan of attack by the defendant; the killing was a senseless and brutal stabbing in front of other people; the victim suffered great physical and psychological pain before death; defendant failed to exhibit any remorse after the killing; the jury found the "especially heinous, atrocious, or cruel" aggravating circumstance; the jury found only one statutory mitigating circumstance, that the crime was committed while the defendant was under the influence of mental or emotional disturbance; and the jury found five nonstatutory mitigating circumstances.

**Am Jur 2d, Criminal Law §§ 538, 609.**

Justice PARKER did not participate in the consideration or decision of this case.

Appeal of right by defendant pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Burroughs, J., at the 3 June 1991 Criminal Session of Superior Court, Mecklenburg County, upon a jury verdict finding defendant guilty of first-degree murder. Execution stayed 9 July 1991 pending defendant's appeal. Heard in the Supreme Court 10 September 1992.

*Lacy H. Thornburg, Attorney General, by Ralf F. Haskell, Special Deputy Attorney General, for the State.*

*Richard B. Glazier for defendant appellant.*

WHICHARD, Justice.

Defendant was tried on an indictment charging him with the first-degree murder of his wife, Teresa Yousef Syriani. The jury returned a verdict finding defendant guilty upon the theory of premeditation and deliberation. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death. For the reasons discussed herein, we conclude that the jury selection, guilt, and sentencing phases of defendant's trial were free from prejudicial error, and that the sentence of death is not disproportionate.

The State's evidence tended to show the following: Defendant and his wife were living apart, defendant in a motel, and his wife with their children in their home. On 28 July 1990, around 11:20 p.m., defendant drove to their home, but his wife had not returned from work. As she drove her automobile onto a nearby street, defendant blocked her way with his van. Defendant got out of his van, gestured, and chased after her car as she put it in reverse. As his wife sat in her car, defendant began stabbing her with a screwdriver through the open door or window, while their ten-year-old son John sat in the seat beside her. John was unable to stop his father; he got out of the car and ran home to get his older sister. At least two neighbors watched from their homes as defendant stabbed his wife and then walked away. Teresa Syriani died twenty-eight days later due to a lethal wound to her brain.

Boyd Wilson testified that he lived in the Syrianis' neighborhood. He knew defendant's son but only knew defendant by sight. On 28 July 1990, around 11:20 p.m., Wilson was at home when he heard children hollering. He looked out his window and saw a van parked across the street with the interior lights on and the door open. He looked again and watched defendant come toward the van, get into the driver's seat, and fumble with something. Then he saw defendant go back down the street and cross the street to a car in the driveway of the house next to Wilson's. Defendant leaned over inside the car. Wilson saw the car shaking. Then Wilson went outside, whereupon he saw defendant back in the van. He also saw two young boys, John Syriani and John's friend. Wilson heard a young woman hollering "somebody help my mother" and went to the car. A woman in the car was covered in blood. A neighbor wiped her face. She looked to him "like somebody [who] had been shot in the face with a load of buckshot."

Thomas O'Connor testified that he lived near the Syrianis but did not know them. On 28 July 1990, around 11:20 p.m., he received a phone call from a neighbor prompting him to look out his window. O'Connor saw a man standing at a car halfway in a driveway holding what appeared to be a screwdriver and "stabbing into the car." O'Connor ran outside, yelling, and made eye contact with the man. The man kept stabbing into the car. O'Connor ran back inside to phone the police, then ran outside. He saw the van pulling away. The van stopped and the man, screwdriver in hand, got out and walked toward the car. The man saw O'Connor, turned back to the van, and drove away.

John Syriani, defendant's eleven-year-old son, testified that the family had lived in the house in Charlotte since 1986 except for a week in the summer of 1988 when the police took him, his sisters, and his mother to a Battered Women's Shelter. Then they stayed with his mother's sister in New Jersey for about a month. When defendant came to take them back, they returned to Charlotte. In July 1990 he, his three sisters, and his mother lived in a motel. They moved back to their home when defendant moved out.

On 28 July 1990, John went with his mother to the Crown gas station. His father came by and asked him to go out with him. John rode home with his mother and saw his father's van stopped ahead as they approached their home. As his mother approached the turn onto the main street before their house, defendant moved the van to block her way. Then defendant got out of the van, gestured, and chased the mother's car. She put the car in reverse. Defendant opened the door and started stabbing John's mother, who started screaming. John tried to push his father's hands off her, but he could not stop his father. John ran home to get his older sister and told her, "Dad is killing Mom." John then ran to his friend's house. John and his friend ran back to his mother's car, now in a neighbor's driveway. Defendant was kneeling at the open door, stabbing into the car. Defendant then walked back to the van and yelled, "Go home bastard," in Arabic, to John. Frightened, John ran back down the street. Neighbors took John into their home.

On cross-examination, John testified that his father worked long hours. His father always carried a screwdriver as part of his work tools. His mother had never worked, had dressed according to Arabic tradition, and had worn no makeup or lipstick before

they moved to Charlotte. His parents had argued, but mostly over the children. In 1988 or 1989, John's mother decided she did not like staying at home and wanted to get a job. At her second job at a gas station, she worked some nights. When his mother worked nights, his older sister babysat. Starting in 1990, his parents argued more frequently. Defendant did not like the fact that John's mother was working; he wanted her to stay home with the children. In July 1990, defendant moved into a motel.

When he first spotted the van the night of 28 July 1990, John thought the motor was turned off because the headlights were turned off. Defendant, however, turned on the headlights and turned his van to the right across the street. Defendant had stabbed John's mother once before the car came to a complete stop in a driveway.

On redirect examination, John recalled seeing his father slap his mother when he was five and hit his mother in "the ear" on Easter Sunday, 1989. John also recalled seeing his mother "screaming and running out of the house" while his father stood at the door in the summer of 1988. Finally, John testified that his mother was a good mother. She and his father argued about three times a week, and his father called her names, for example, "whore."

Rose Syriani, defendant's eldest daughter, testified about the events leading up to the stay at the Battered Women's Shelter in the summer of 1988. Rose and her mother were at home when defendant came in and threw the groceries at them. Defendant started to scream at his wife, jumping up and down and breaking a table with his foot. Then defendant went into the garage and returned with a large wooden bat. He ran upstairs after her mother, who had left the house. The police showed up shortly thereafter and took the mother and children to the shelter. Contrary to John's testimony, Rose testified that her parents fought constantly in Illinois. In the summer of 1990, her mother was sleeping in the younger daughter's bedroom. In July, they moved to a motel.

On 28 July 1990, John came to the front door banging and screaming, "Dad is trying to kill Mom." Rose called the police, saw her brother coming back, and ran to her mother. She saw her father enter his van, look at her, and drive away. When she reached her mother, her mother said, "Ma Ma, shut up." "Ma Ma" is Arabic for "honey."

On cross-examination, Rose maintained that her parents were always arguing and defendant would jump and yell at her mother, although there were times when her parents did not argue. Sometimes her father "would go downstairs around three o'clock in the morning . . . and just start breaking things downstairs." During arguments between January and July 1990, her mother would say she would quit her job if defendant would buy food the children liked to eat. Rose also testified about the time defendant started yelling at her in Arabic and grabbed her around her throat, saying he was going to kill her. Rose remained angry with her father in 1988, 1989, and 1990 because he constantly disciplined the children—for example, they were not allowed to play outside after 5:00 p.m.—and he argued with her mother.

On redirect, Rose testified that her mother told her to "shut up" because she was screaming, holding her mother's hand, trying to sit her mother up, and shaking her to see if she were still alive. Once her mother spoke, she stopped shaking her and went for help.

Rose then testified about a number of specific instances of verbal and physical abuse by her father. When defendant thought she had scratched his new van, he grabbed her and started to kick her. Crying, she ran out of the house. She testified: "[H]e got me on the floor and kicked me . . . into the ground. People were walking by and my mom pulled his leg off me." Defendant told her mother he would kill her if she ever left him, that she would not live without him, and that he would "f— up our world."

On recross-examination, Rose testified that the children were always scared of their father even though he provided well for them.

Jeane Allen, a registered nurse at the Carolinas Medical Center, testified that she saw Mrs. Syriani at 12:24 a.m. on 29 July 1990. The victim was covered in blood and suffered from lacerations to her arm, right side, and face. As she was being moved, she grasped her jaw and complained, "It hurts." Monitors showed she had difficulty breathing, so someone inserted a tube through her nose into her lungs to facilitate breathing. On cross-examination, Allen testified that the cuts below the victim's temple area were superficial but the ones above were not.

Kenneth C. Martin, an attorney, testified that the victim had asked Martin to represent her in a domestic action against defend-

ant in November, 1989. He prepared a complaint against her husband, but she only decided to file it on 27 June 1990. An *ex parte* domestic violence order was issued on 5 July 1990.

Alice Safar, the victim's older sister, testified that she visited her sister at the hospital on 29 July 1990. Mrs. Syriani squeezed her hand when Safar spoke to her. On cross-examination, Safar testified that the marriage between her sister and defendant had been arranged.

Dr. James Sullivan, a forensic pathologist and medical examiner, testified that he performed an autopsy on the victim's body on 24 August 1990. Seven healed wounds were located on her left cheek, five wounds on the left side of her neck, five wounds on her right cheek and around her mouth, and five wounds to the back of her right hand and arm. There were visible healed wounds in the mouth where the victim's jaw had been fractured, and several of her teeth had been fractured or lost. Several of the wounds had been sutured. All of the wounds had a linear or rectangular configuration.

However, in Sullivan's opinion, the chronic penetrating brain wound caused the victim's death. A three-inch deep puncture wound to the right temple, to the right of her right eye, penetrated the victim's brain, going through the right temporal lobe and into the deep central area of her brain known as the basal ganglia area. Such a wound would cause brain dysfunction, unconsciousness or coma, infarct or stroke, and paralysis on the left side of her body. There was a small rectangular defect in the approximately one-eighth-inch-thick bone. The wound was caused by a narrow instrument like a squared-off pick, screwdriver, or knife. Sullivan opined that it would take a substantial amount of force to penetrate an adult's skull.

On cross-examination, Sullivan testified that none of the arm or hand wounds were life threatening.

Charlotte Police Department Investigator Hilda M. Griffin testified she arrived at the scene around 11:37 p.m. She found the victim alive, sitting in the car with her head laid back. Blood was everywhere. Mrs. Syriani tried to speak, but Griffin could not tell what she was saying. When Griffin arrived at the fire station where defendant had stopped for first aid, defendant had already been arrested, and his van had been searched. He appeared

sober. There was blood all over him, but only some light scratches on his arm and shoulder. Griffin testified that a team searched for, but never found, the murder weapon.

Dr. Richard C. Stuntz, Jr., the first witness for the defendant, testified that on the morning of 29 July 1990, he treated defendant in the emergency room of Carolinas Medical Center. Defendant's hand was bruised. There was an abrasion on his lower left leg, and there were scratches on his nose and shoulder which could have been caused by a fingernail. His hand was X-rayed, and he was treated with a tetanus shot and pain medicines. On cross-examination by the prosecutor, Stuntz testified that defendant told him he had been assaulted by his wife.

Charles M. Stanford, a fireman, testified that around 1:00 a.m. on 29 July 1990 defendant walked into his station. Stanford tended to scratches on defendant's face, arms, and chest. Defendant told him he had been in a fight. On cross-examination, Stanford testified that defendant said his wife had assaulted him.

Walid Bouhussein testified that he lived two or three blocks from the Syrianis and had known them almost three-and-one-half years. Their families exchanged visits and ate together a number of times. He had never seen any arguments between defendant and his wife. His children felt "a warmth" toward the defendant. Both defendant and his wife were very nice people, neither appearing violent nor showing temper. Defendant was very hospitable, a "mild-mannered man." On cross-examination, Bouhussein admitted that Mrs. Syriani had told his wife that defendant mistreated her.

On redirect, Bouhussein testified that defendant was known in the community as a very hard-working, mild-mannered man. He did not have a reputation for violence, but he did have a reputation for truth and veracity. Upon recross-examination, the prosecutor questioned Bouhussein about specific instances of defendant's misconduct toward his wife and children.

Michael Carr, a domestic law attorney, testified that he had talked with defendant about the *ex parte* domestic violence order. At the 12 July 1990 hearing defendant and his wife agreed to joint counseling, but a few days later Mrs. Syriani changed her mind and no longer wanted it. Carr testified that defendant had wanted very much to be reconciled with his wife.

David D. Stevens testified that he first met defendant in 1983 when they worked at Kerr Glass in Chicago. Defendant was a good worker. When Kerr Glass closed, Stevens moved to Charlotte, became a supervisor at Midland Machine Corporation, and hired defendant. During the time he knew them, he never noticed a problem between the Syrianis. The children did not appear to be afraid of their father. Further, defendant never argued with, abused, or fought with any fellow employees. On cross-examination, however, Stevens conceded that he had told defendant's current boss not to hire defendant because he had a "terrible temper and the men were afraid of him."

Harold Linn testified that he had been a plant superintendent with Protective Door Manufacturing Company and had met defendant in 1977. Defendant was looking for work, and Linn hired him. Linn considered defendant a terrific employee, one of the hardest workers at the plant, capable of "great, beautiful production." Even after Linn retired and moved to North Carolina, he maintained contact with the Syriani family. He was very close to defendant. He respected him very much as a man who had earned everything for himself, having come to this country with only a few dollars in his pocket.

Linn also testified that there seemed to be a great deal of love in the Syriani household, and the Syriani children always seemed to enjoy having the Linns visit. They were "bright kids, very well trained. You couldn't ask for a better family."

The prosecutor cross-examined Linn with regard to specific acts of misconduct by defendant toward his wife and children. Linn replied that he could not believe any of those things occurred, that it was not in defendant's nature, and that all he ever saw was that defendant had "good and deep family devotion, the kind that most of us would envy."

Florence Linn, Harold Linn's wife, testified that when the Linns visited the Syriani home they never observed discord or arguments. She never noticed abusive conduct by defendant toward his wife or children, only "loving conduct." She thought a better family atmosphere could not have been asked for, and that the children were bright, healthy, and well-loved.

Odett Syriani, defendant's older sister, testified that the Syriani children now live with her in Illinois. Her brother's marriage had

STATE v. SYRIANI

[333 N.C. 350 (1993)]

been arranged. Teresa Syriani, the victim, had been living in New Jersey. Teresa and Odett's brother were married in Jordan, and he followed his wife back to the United States. Odett visited the family for six months in 1987, and later the family visited Odett in Chicago. She did not notice any problems between defendant and his wife. They seemed to get along very well together.

Defendant testified on his own behalf. Born in Jerusalem in 1938, he had to leave school at age twelve when his father, a laborer, became sick. He worked to help his mother support his three sisters and two brothers. He learned the machinist trade. He entered the Jordanian Army at age nineteen as a civilian machinist. His sisters did not work because "their job was to finish school, then they engage and then they get married." After leaving the army, he worked in a garage and then as a singer on a radio station. At the age of thirty-six he married Teresa in Amman, Jordan. She was twenty-four. Friends had arranged the marriage. She returned to the United States, and he followed. They lived in Washington, D.C., where he worked as a busboy and learned English at night. They then moved to Chicago, where defendant found work as a machinist with Protective Door.

When Protective Door closed some six years later, defendant went to work for Kerr Glass Manufacturing, where he stayed almost six years. Although Mrs. Syriani had worked at Woolworth's, she had stayed at home after the birth of Rose, their first child. Defendant purchased a home for his family in Calumet City, Illinois, near Chicago. When Kerr Glass closed in 1986, defendant moved to North Carolina, found a job and a place to live, and brought his family to Charlotte.

While in Chicago, he and his wife rarely argued. When they did, it was nothing of a serious nature. They spoke Arabic in their home. Whenever he was away, he called the family every night, and they missed him very much. In Charlotte, Mrs. Syriani asked if she could take a part-time job. He bought another car for her use. Her first job was in a restaurant, but she quit and found work at a local service station. After she began working, she changed "fast[,] very fast." Although he loved his wife, he was not happy with the change. Despite the problems caused by his wife's deviation from Arabic tradition, defendant did not strike his wife. Rather, he tried to make her "more happy."

Defendant recalled receiving papers from a lawyer about his wife's request for a divorce. In July 1990, she came home with

police officers and told defendant he had to leave his keys and move out of the home. Defendant packed his clothes and moved into a hotel room.

Defendant visited the neighborhood several times. He saw John skateboarding outside and asked John to tell his mother he wanted to talk with her. John did not respond. Another time, defendant asked John to ask his mother for the small television because he did not have one in his hotel room. Mrs. Syriani refused his request.

On 27 July 1990, defendant worked his normal half day. Late that evening, he saw his son outside the gas station. He asked John whether he could go to lunch with him the next day. Mrs. Syriani said John could not go with his father.

On 28 July 1990, defendant went to the gas station and asked whether John could go out to lunch, but Mrs. Syriani refused to let the child go. Defendant returned to his motel room. Around 8:00 p.m., he went to the supermarket near the gas station. He did not see his wife's car pass by and believed that his wife was still working at 11:00 p.m. Concerned about the family's safety, he left the supermarket and went to their home, but his wife was not there. On his way to the gas station to ascertain why his wife was late in coming home, he saw her car. She stopped her car, and he went up to ask about his children and who was supervising them. She scratched his face, and he pushed her away. She opened the driver's side door, hitting him in the leg. He grabbed the door, and she placed the car in reverse. He struck at her through the open window with a screwdriver he had in his pocket, trying to get her to stop moving the car. He never had any desire to hurt or kill his wife and remembered hitting her only three or four times. He loved his wife very much.

On cross-examination, defendant recalled the time in 1985 when he thought his daughter Rose had scratched his new van. He did not drag her by the hair and kick her. He spanked her on the "butt." It was the first spanking he had ever given her. Defendant denied pulling hair out of his wife's head over an argument about a washing machine. He denied knocking Sara down and kicking her in the summer of 1989. She had lost her tennis shoe, and he only spanked her on the bottom. He denied ever putting his hands around Rose's throat. Defendant admitted he had hit his wife when they had lived in Illinois and had hit her on the hand

STATE v. SYRIANI

[333 N.C. 350 (1993)]

while driving in the van on Easter Sunday, 1989. They had been arguing about lamps, and she had put her hand on the door as if to open it.

Defendant testified that during the last three months of their marriage his wife beat him, sometimes in front of the children. On the night she told him she would leave him, she hit him and then called the police to escort her and the children away from their home. Fifty minutes later, defendant called the police and told them his wife had assaulted him but he did not want her arrested. Defendant stated that he loved his wife and children, and up until the end he hoped he and Teresa would reconcile.

Cindy Smith testified for the State on rebuttal. She lived next door to the Syrianis in Charlotte. Smith thought Mrs. Syriani was a gentle person, but her husband had a violent temper. Upon cross-examination, Smith admitted that she had never heard an argument, that the Syrianis were a discreet family and conducted their business within their home, but she could see that defendant had an incredible temper "from the fear and the terror in the children's faces and Teresa['s]."

Defendant moved to dismiss at the close of the State's evidence. The trial court denied the motion. The jury found defendant guilty of first-degree murder based on premeditation and deliberation.

At the capital sentencing hearing, defendant testified that he had been out on bond for a short time, during which he had arranged for the care of his children. He testified that he felt "real, very terrible" about what had happened, that he loved his wife and missed her very much, and that he was very sorry for what he had done. He reiterated that at the time of the confrontation with his wife, he was very emotional and upset, feeling he was going to lose his wife and family. Finally, he testified that in his eleven months in jail he had never been cited for any misconduct or caused trouble for anyone.

Michael Thomas McCarn, a deputy with the Mecklenburg County Sheriff's Department, testified that during defendant's eleven months of incarceration he never gave anyone trouble, was "very cooperative," and was a model prisoner.

In rebuttal, Sara Syriani, defendant's second oldest daughter, testified for the State that on one occasion her father threatened her mother with a pair of scissors. On Easter Sunday, 1988, he

## STATE v. SYRIANI

[333 N.C. 350 (1993)]

hit her mother. Further, her father had yelled at her, pushed her down, and kicked her. Finally, on her graduation from sixth grade, he had yelled at the victim, followed her upstairs, grabbed her by her hair, thrown her down the stairs, and dragged her into the kitchen, ripping her shirt.

Following the capital sentencing hearing, the jury found one aggravating circumstance—that the murder was especially heinous, atrocious, or cruel—and eight mitigating circumstances. Among these was one statutory mitigating circumstance, that the murder was committed while defendant was under the influence of mental or emotional disturbance. The remaining nonstatutory mitigating circumstances pertain to defendant's understanding of the severity of his conduct, defendant's demonstrated ability since his incarceration to abide by lawful authority, defendant's history of good work habits, defendant's history of being a good family provider, defendant's good character or reputation in the community in which he lived, defendant's upbringing in a different culture, and defendant's aggravation by events following the issuance of the *ex parte* domestic violence order.

Upon finding that the mitigating circumstances were insufficient to outweigh the aggravating circumstance, and that the aggravating circumstance was sufficiently substantial to call for the death penalty, the jury recommended a sentence of death.

JURY SELECTION ISSUES

[1] Defendant first contends that the trial court erred in excusing a prospective juror for cause because of his views on the death penalty, thereby denying defendant his rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendant contends that jurors may be excused for cause only if they are unequivocally opposed to capital punishment or if they would "automatically" vote against imposition of the death penalty.

The standard for determining whether a prospective juror may be properly excused for cause for his views on capital punishment is whether those views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985); *accord, State v. Davis*, 325 N.C. 607, 621-22, 386 S.E.2d 418, 425 (1989), *cert. denied*, 496 U.S. 905,

STATE v. SYRIANI

[333 N.C. 350 (1993)]

110 L. Ed. 2d 268 (1990). This Court has recognized that a prospective juror's bias may not always be "provable with unmistakable clarity [and,] [i]n such cases, reviewing courts must defer to the trial court's judgment concerning whether the prospective juror would be able to follow the law impartially." *Davis*, 325 N.C. at 624, 386 S.E.2d at 426.

> Many veniremen simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law.

*Wainwright*, 469 U.S. at 425-26, 83 L. Ed. 2d at 852.

The transcript reveals that Ramon Masterson responded firmly and unequivocally to the court's initial queries about Masterson's understanding that the defendant has the presumption of innocence and the State the burden of proof. But, in response to the court's query about whether he had any "personal convictions about the death penalty which would prevent or substantially impair the performance of [his] duty in accordance with the [c]ourt's instructions and [his] oath at the guilt . . . phase of the trial," Masterson responded equivocally, "I don't know on the death penalty. I'm not certain." The court asked whether he would be "able to vote for the death penalty if the proper circumstances were presented to [him]?" Masterson responded, "I'm not certain." He agreed with the court's suggestion that he would not "unequivocally vote against the death penalty." But in response to the question, "would you be able to convict the defendant knowing that the conviction meant the possible imposition of the death penalty," he responded, "I'm not certain of that." The court again asked him whether "it was fair to say that [he] would not recommend the death penalty under any circumstances." Masterson responded, "I feel reserved on that. I don't know." The court queried whether "it [is] fair to say that you would vote against the imposition of the death penalty without regard to the evidence." Masterson responded, "Well, no, I don't think so."

Following the court's voir dire, the prosecutor asked, "If the State meets its burden of proof and proves to this jury that the death penalty is the appropriate punishment, would you be able to walk back to this courtroom, stand up by yourself, look at the defendant and say, 'I sentence you to be executed?'" Masterson replied, "I don't think I could do that." In response to the question, "And is that due to your reservations . . . about the death penalty," he replied, "I just don't believe in that." In response to the question, "You just don't believe in the death penalty," he replied, "I don't believe in an eye for an eye." The prosecutor asked again whether his beliefs would prevent or substantially impair the performance of his duties in accordance with the court's instructions and his oath, and he responded, "I could possibly say yes." Finally, the prosecutor asked,

> [I]f you don't feel like you could impose the death penalty and if the law is that if you are convinced the death penalty is the appropriate punishment you must vote for the death penalty, then it would be fair to say . . . that would interfere with your ability to perform your duties under your oath?

Masterson replied, "I guess so."

Masterson's equivocal yet conflicting responses exemplify the situation anticipated by the United States Supreme Court in *Wainwright*. "[D]eterminations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." *Wainwright*, 469 U.S. at 424, 83 L. Ed. 2d at 852. His responses nonetheless reveal that he did not believe in the death penalty, and he thought his views on the death penalty would interfere with the performance of his duties at both the guilt and sentencing phases. Masterson could not affirmatively agree to follow the law in carrying out his duties as a juror; therefore, the trial court did not err in excusing him for cause. N.C.G.S. § 15A-1212(8) (1988); *see Davis*, 325 N.C. at 624, 386 S.E.2d at 426. This assignment of error is overruled.

Defendant next contends the trial court erred in sustaining the State's objection to four questions defendant posed to prospective jurors, thus preventing him from obtaining information necessary to exercise his "for cause" and peremptory challenges intelligently so as to secure an impartial jury. We conclude this contention is without merit.

"The prosecutor and the defense counsel . . . may personally question prospective jurors . . . concerning their fitness and competency to serve as jurors in the case . . . ." N.C.G.S. § 15A-1214(c) (1988). Moreover, neither is "foreclosed from asking a question merely because the court has previously asked the same or [a] similar question." *Id.* This statutory right to voir dire examination serves a double purpose, first, to determine whether a basis for challenge for cause exists, and second, to enable counsel to intelligently exercise peremptory challenges. *State v. Soyars*, 332 N.C. 47, 56, 418 S.E.2d 480, 486 (1992). The extent and manner of that inquiry, however, rest within the sound discretion of the trial court. *Id.* Therefore, defendant must show prejudice, as well as a clear abuse of discretion, to establish reversible error. *Id.*

[2] During examination of the first twelve prospective jurors passed by the State, defendant asked the following questions:

[DEFENSE COUNSEL]: Is there any member of the jury that has any expectation at this point that this defendant is going to be proven guilty?

[PROSECUTOR]: Objection.

COURT: Sustained.

[DEFENSE COUNSEL]: Does any member of the jury feel that merely because the defendant has been charged with a crime that that is any evidence of guilt?

Anybody feel that way, that the mere fact that [he] has been charged with this crime is any evidence of guilt?

Does any member of the jury feel merely because the defendant is sitting here charged with a crime that he must have done something wrong or he wouldn't be here?

[PROSECUTOR]: Objection.

COURT: Sustained.

Defendant contends that the court's refusal to allow him to ask the first two of these questions denied him the right to determine whether there were any prospective jurors who had formed an opinion as to the guilt or innocence of the defendant based solely on the charge before the court. The court apparently sustained an objection to the form of the question, because it immediately allowed defendant to ask two almost identical questions.

(Defendant mistakenly asserts that the prosecution objected to the second question.) The trial court therefore did not abuse its discretion in refusing to allow defendant to ask this question.

[3] During examination of the second panel of jurors passed by the State, defendant asked the following:

> [DEFENSE COUNSEL]: This question is to all of you. Do you feel that because the defendant is charged with a crime and is seated here, that he may be guilty of something?
>
> [PROSECUTOR]: Objection.
>
> COURT: Sustained.
>
> [DEFENSE COUNSEL]: You did tell the Judge that you knew he was presumed to be innocent when he asked you that question. Do you all still agree with that?

Defendant again contends that he was denied the right to determine whether there were any prospective jurors who had formed an opinion as to his guilt or innocence based solely on the charge before the court. However, following the court's sustaining of the objection to the question, defendant reminded the jurors about the presumption of innocence and asked whether they all still agreed with that presumption. Further, and subsequently, defendant individually questioned each juror on this second panel passed by the State. Prospective juror Woods was asked whether the newspaper account she admitted reading would tend to influence her in her final judgment, whether she was willing to hear all the evidence and hear defendant's side of it, whether she had formed any opinion and whether she presumed defendant to be innocent. Juror Roper was asked whether he had formed an opinion and whether he could be fair and impartial. Roper had three small children of his own, and defendant questioned whether Roper could remain impartial because the State's witnesses included small children. Juror Price was asked whether his mind was clear and whether defendant would be starting "even with the board." Juror Sebring was asked whether he had yet formed any opinion and whether his mind was clear. Defendant found all four jurors satisfactory. Moreover, their answers were informed answers. Prior to questioning by either the prosecutor or defense counsel, the court had carefully instructed these jurors that the fact that defendant was charged was not evidence of guilt, that defendant was not required to prove his innocence, that defendant was presumed inno-

cent, and that the burden was on the State to prove guilt beyond a reasonable doubt. Because defendant was able to pursue the relevant inquiry, with an informed panel, he has shown neither abuse of discretion nor prejudice.

[4] Finally, during examination of Tonya Pettit the following occurred:

> [DEFENSE COUNSEL]: Are you a person who has pretty strong opinions and pretty well stick[s] to your opinions when you make them, or are you easily swayed?
>
> [PROSECUTOR]: Objection.
>
> COURT: Sustained.
>
> [DEFENSE COUNSEL]: Can you sit down and deliberate with other people pretty regularly?
>
> JUROR PETTIT: I think so, yes, sir.

In the context of defendant's extensive voir dire examination of Pettit, it is clear that defendant was interested in determining whether Pettit had formed an opinion with regard to defendant's guilt or innocence and whether she could be fair and impartial. Defendant asked Pettit numerous personal questions designed to elicit these relevant qualifications, including whether the facts that her brother-in-law was a law enforcement officer, or that she had formerly worked for the district attorney, or that her daughter had been a victim of crime, would predispose her to favor the State's case. After sustaining the State's objection to the one question above, the court permitted defendant to ask Pettit whether she could deliberate with others, which was the crux of the excluded question. See Black's Law Dictionary 426 (6th ed. 1990) ("deliberate" means "[t]o examine and consult in order to form an opinion. To weigh in the mind; to consider reasons for and against"); Webster's Third New International Dictionary 596 (1976) ("deliberate" means "to ponder or think about with measured careful consideration and often with formal discussion [and consultation] before reaching a decision"). If defendant wanted to determine how well Pettit could stand up to other jurors in the event of a split decision, the question amounted to an impermissible stake-out. State v. Bracey, 303 N.C. 112, 119, 277 S.E.2d 390, 395 (1981) (hypothetical question, if you held an opinion that the defendant was not guilty, would you change your opinion simply because

eleven other jurors held a different opinion, could not reasonably be expected to result in an answer bearing upon the qualification of the juror; constituted impermissible stake-out). Defendant finally concluded that he was satisfied with Pettit. He had not exhausted his peremptory challenges and was therefore not forced to accept any juror objectionable to him. *See, e.g., State v. Lloyd*, 321 N.C. 301, 307-08, 364 S.E.2d 316, 321, *sentence vacated*, 488 U.S. 807, 102 L. Ed. 2d 18, *on remand*, 323 N.C. 622, 374 S.E.2d 277 (1988), *sentence vacated*, 494 U.S. 1021, 108 L. Ed. 2d 601 (1990), *on remand*, 329 N.C. 662, 407 S.E.2d 218 (1991). For these reasons, defendant has not shown either abuse of discretion or prejudice. Accordingly, this assignment of error is overruled.

## GUILT PHASE ISSUES

Defendant contends that the trial court erred in overruling his objections and allowing testimony by his children—John, Rose and Sara Syriani—about defendant's specific instances of prior misconduct toward them, contrary to Rules 404(b) and 403 of the North Carolina Rules of Evidence.

John Syriani, age eleven, testified for the State. During cross-examination, John responded to many questions about how well his parents got along. John testified that his father was a giving person and his parents got along, but sometimes they argued. Beginning in 1990, they argued more and more. In July 1990, defendant moved out of the house. During redirect examination, John testified, over objection, that when he was five, he saw his father slap his mother. Further, he frequently heard his parents arguing and heard defendant call the victim "whore." John further testified, without objection, that his parents argued a lot, his father backhanded the victim during an argument on Easter Sunday, 1989, and that in 1988, prior to the stay at the Battered Women's Shelter, John saw her screaming and running from the house while his father stood in the doorway.

Rose Syriani, age fourteen, testified on direct examination, without objection, that in Illinois her parents were constantly fighting. Sometime during the summer of 1988, she left the house with her mother and siblings and went to the Battered Women's Shelter. Rose recalled, without objection, that on the day before, defendant had entered the house, thrown down the groceries he was carrying, and started screaming at her mother. Jumping up and down, defendant broke a table with his foot and called her

and her mother "nasty" names. Defendant left the house but returned with a big wooden bat, with which he threatened them, trying to scare them. Rose got in front of her mother, trying to keep her father away from her mother. "[A]nd he was over me with a bat trying, you know, trying to scare us." Rose recalled that defendant later chased her mother out of the house with the bat.

During cross-examination, Rose testified that her parents would always get into bad arguments, that defendant would jump at her mother, start screaming for no reason, slam doors and break tables. In the six months before her mother's death, her parents argued about her mother's working. Then defense counsel asked Rose, "Has he ever beat you?" She replied affirmatively. While living in Charlotte, he started yelling at her, grabbed her by the throat, and said he was going to kill her.

During redirect examination, Rose testified, over objection, that defendant had also grabbed her by the hair and kicked her sometime two or so years before. Also over objection, Rose testified that defendant told her mother he would kill her if she ever left him. "He told her that she would not live without him. She wouldn't live at all." Finally, Rose recalled, over objection, that shortly before killing her mother, defendant had said that if her mother ever left him he would mess up the children's world.

Defendant contends that the evidence of specific instances of misconduct toward his wife and children was elicited from his children only to prove defendant's character, to show that he acted in conformity therewith, or alternatively, that the incidents were too remote in time, some more than two years prior to the killing, or insufficiently similar in nature to defendant's assault on their mother, to be admissible. See State v. Artis, 325 N.C. 278, 299, 384 S.E.2d 470, 481 (1989) (use of evidence under Rule 404(b) is guided by two constraints, similarity and temporal proximity), sentence vacated, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), on remand, 329 N.C. 679, 406 S.E.2d 827 (1991). Defendant failed to object to the testimony about several incidents, and our review of that testimony is limited to consideration of whether its admission constituted plain error.

[5] We conclude that the testimony about defendant's misconduct toward his wife was proper under Rule 404(b) to prove motive, opportunity, intent, preparation, absence of mistake or accident with regard to the subsequent fatal attack upon her. Rule 404(b)

provides that while "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith," such evidence "may . . . be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident." N.C.G.S. § 8C-1, Rule 404(b) (1992).

> "Rule 404(b) state[s] a clear general rule of *inclusion* of relevant evidence of other crimes, wrongs or acts by a defendant, subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged."

*State v. Hill*, 331 N.C. 387, 405, 417 S.E.2d 765, 773 (1992) (quoting *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990)), *cert. denied*, --- U.S. ---, --- L. Ed. 2d ---, 1992 WL 347109 (1993).

" 'When a husband is charged with murdering his wife, the State may introduce evidence covering the entire period of his married life to show malice, intent and ill will towards the victim.' " *State v. Lynch*, 327 N.C. 210, 219, 393 S.E.2d 811, 816 (1990) (quoting *State v. Braswell*, 312 N.C. 553, 561, 324 S.E.2d 241, 247 (1985)). Specifically, evidence of frequent quarrels, separations, reconciliations and ill-treatment is admissible as bearing on intent, malice, motive, premeditation and deliberation. *State v. Moore*, 275 N.C. 198, 206-07, 166 S.E.2d 652, 658 (1969), *disapproved on other grounds by State v. Young*, 324 N.C. 489, 492, 380 S.E.2d 94, 96 (1989). Further, threats against a victim have "always been freely admitted to identify [the defendant] as the killer, disprove accident or justification, and to show premeditation and deliberation." *Braswell*, 312 N.C. at 561, 324 S.E.2d at 247.

Further still, remoteness "generally affects only the weight to be given . . . evidence, not its admissibility." *State v. Stager*, 329 N.C. 278, 307, 406 S.E.2d 876, 893 (1991); *cf. State v. Riddick*, 316 N.C. 127, 134, 340 S.E.2d 422, 427 (1986) (remoteness relevant to admissibility of prior bad acts to show common scheme or plan). " 'In the domestic relation, the malice of one of the parties is rarely to be proved but from a series of acts; and the longer they have existed and the greater the number of them, the more powerful are they to show the state of his feelings.' " *Moore*, 275 N.C. at 207, 166 S.E.2d at 658 (quoting *State v. Rash*, 34 N.C. 382, 384 (1851)).

**STATE v. SYRIANI**

[333 N.C. 350 (1993)]

For these reasons, we hold that the testimony about defendant's frequent arguments with, violent acts toward, separations from, reconciliations with, and threats to his wife were admissible under Rule 404(b) to prove issues he disputed—that is, lack of accident, intent, malice, premeditation and deliberation—notwithstanding that some of the incidents dated back to the beginning of the marriage. We include herein the baseball bat incident, in which it appears that defendant threatened his wife with the bat and threatened his daughter Rose only incidentally when Rose tried to protect her mother.

**[6]** Defendant also complains about testimony of prior bad acts directed toward the children. Defendant, however, elicited the first instance of misconduct toward daughter Rose from her during cross-examination when he asked her whether he had ever beaten her. Defendant cannot now complain about this evidence. N.C.G.S. § 15A-1443(c) (1988) ("A defendant is not prejudiced . . . by error resulting from his own conduct."). *See, e.g., State v. Greene*, 324 N.C. 1, 12, 376 S.E.2d 430, 438 (1989) (defendant cannot invalidate trial by inviting error, eliciting evidence on cross-examination which he might have rightfully excluded if the same evidence had been offered by the State), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990), *on remand*, 329 N.C. 771, 408 S.E.2d 185 (1991).

Further, we agree with the State that with this question, in the context of a series of questions, defendant opened the door to the State's subsequent question about another specific act of misconduct toward his daughter.

> "[T]he law wisely permits evidence not otherwise admissible to be offered to explain or rebut evidence elicited by the defendant himself. Where one party introduces evidence as to a particular fact or transaction, the other party is entitled to introduce evidence in explanation or rebuttal thereof, even though such latter evidence would be incompetent or irrelevant had it been offered initially."

*State v. Hudson*, 331 N.C. 122, 154, 415 S.E.2d 732, 749 (1992) (quoting *State v. Albert*, 303 N.C. 173, 177, 277 S.E.2d 439, 441 (1981)), *cert. denied*, --- U.S. ---, 122 L. Ed. 2d 136, *reh'g denied*, --- U.S. ---, --- L. Ed. 2d ---, 1993 WL 49522 (1993). Here, defendant elicited from Rose that her father supported the family with a nice house, furniture, a van, food and clothes; that her father was very strict; and that Rose had disliked him for a long

time. Then defendant asked Rose why she so disliked her father and whether he had ever beaten her. Defendant, however, permitted Rose to describe only one time when he had beaten her. The State was entitled to elicit further testimony from Rose to explain her responses — especially why she so disliked her father, which went directly to her credibility — and to rebut the implication that her father had beaten her only the one time.

Defendant contends, in the alternative, that the trial court erred by allowing the inquiry on cross-examination because the probative value of the evidence was outweighed by the risk of unfair prejudice, confusion of issues, or misleading the jury. N.C.G.S. § 8C-1, Rule 403. In general, the exclusion of evidence under the Rule 403 balancing test is within the sound discretion of the trial court. See, e.g., Hill, 331 N.C. at 406, 417 S.E.2d at 773. Abuse of discretion occurs where the court's ruling is manifestly unsupported by reason or is so arbitrary it could not have been the result of a reasoned decision. See, e.g., State v. Phipps, 331 N.C. 427, 453, 418 S.E.2d 178, 191-92 (1992). We conclude that the trial court did not abuse its discretion in allowing the testimony about the specific instances of misconduct toward defendant's wife and children, otherwise admissible under Rule 404(b).

[7] Within this same assignment of error, defendant contends the trial court erred during the sentencing phase in allowing Sara to testify in rebuttal about four specific instances of misconduct toward her mother and herself, contravening both Rules 404(b) and 403. Sara Syriani, age thirteen, testified for the State during sentencing that on one occasion her father threatened her mother with a pair of scissors. On Easter Sunday, 1988, he hit her mother. Further, her father had yelled at her, pushed her down, and kicked her. Finally, on her graduation from sixth grade he had yelled at the victim, followed her upstairs, grabbed her by her hair, thrown her down the stairs, and dragged her into the kitchen, ripping her shirt.

We have already determined that the testimony about defendant's specific misconduct toward his wife was properly admitted in the guilt phase. Defendant subsequently presented character evidence through other witnesses, including evidence of his character for non-violence. Further, defendant requested submission of the statutory mitigating circumstance that he had no significant history of prior criminal activity. Because defendant proffered evidence

of his character, including his character for non-violence, the State was entitled to impeach him, in proper order, by rebuttal evidence. *See, e.g., Hudson,* 331 N.C. at 153-54, 415 S.E.2d at 749. This assignment of error is overruled.

Defendant next contends that the trial court erred in allowing the prosecution, during its cross-examination of defendant, to repeatedly attempt to impeach him with allegations of prior misconduct toward his wife and children, contravening Rules 404(b), 403 and 608(b) (evidence of specific instances of conduct for the purpose of proving credibility of a witness or lack thereof). Defendant did not object to all such questions, but contends that it was plain error to allow the questions. Defendant testified upon direct examination that he was a loving, supportive husband and father. He bought the family a house in Calumet City, Illinois. When they moved to Charlotte, he invested all his savings in another house with new furniture and a van for family travel. His wife and children missed him when he was away in Charlotte and called him every night. They were very happy together. While he and his wife lived in Chicago they had arguments, but nothing serious. When the family moved to North Carolina, he and his wife did not have any marital problems of which he was aware. After his wife learned to drive and got a job, however, she changed a lot. During the two-and-one-half years that she worked at a gas station prior to her death, they had several serious arguments. During the last two years he discovered his wife was going to get a divorce. He never hit his wife during those two years, but rather tried to make her more comfortable and happy. About four weeks before her death, his wife and children left their home for two weeks, and when they returned he was served with papers by a police officer and told he would have to leave.

Defendant also testified on direct examination, regarding the night of the killing, that he never desired to hurt or kill his wife. He had only wanted to ask about the children, and she scratched his face, opened the car door, hit him hard in the leg, and put the car in reverse. He had grabbed onto the door and hit her through the open window with a screwdriver from his pocket, trying to get her to stop moving the car.

During cross-examination the prosecutor asked defendant, over objection, whether he tore his wife's hair out of her head over an argument about the family washing machine in 1980; whether

he threatened his wife with a pair of scissors in 1982; whether his wife's brother ever talked with him about beating his wife; whether he used a baseball bat to drive her out of the house and to the Battered Women's Shelter on the night of 21 June 1990; and whether he remembered getting so angry that night when he learned that his wife was going to leave him and take the children that he told her, "If you don't live with me, you won't live at all," and he would "f— up her daughters, too." The prosecutor also asked defendant, without objection, whether he remembered that he had thought daughter Rose scratched his new van, and he got so angry with her that he knocked her down, dragged her by her hair and kicked her; whether he backhanded his wife on Easter Sunday, 1989; whether he would get angry and hit his wife because she would argue with him about furniture needed for the house and clothes and toys for the children; whether he knocked down his daughter Sara and kicked her twice in the summer of 1989 because she lost her tennis shoe; and whether he had put his hands around his daughter Rose's throat and threatened to kill her because she was fighting with her brother John.

Rule 611 provides that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility." N.C.G.S. § 8C-1, Rule 611. In North Carolina, the substantive cross-examination is not confined to the subject matter of direct testimony and impeachment. *See* 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 35 at 181-84 (3d ed. 1988). The scope of cross-examination is within the sound discretion of the trial court. *Coffey,* 326 N.C. at 290, 389 S.E.2d at 61.

[8]  We hold the cross-examination with regard to both defendant's specific and general misconduct toward his wife proper under Rule 404(b) because the State proffered the evidence to establish lack of accident, intent, malice, premeditation and deliberation, not to prove that defendant acted in conformity with a violent character. *Cf. State v. Morgan,* 315 N.C. 626, 639, 340 S.E.2d 84, 93 (1986) (cross-examination of defendant about series of assaults in which he allegedly hurt people other than victim improper under Rule 404(b) because irrelevant to disprove defendant's self-defense defense).

[9]  Defendant correctly states that Rule 608(b) prohibits use of specific instances of misconduct to impeach a defendant upon cross-examination. We have recognized that Rule 608(b) represents a

"drastic departure from the former traditional North Carolina practice which allowed a defendant to be cross-examined for impeachment purposes regarding *any* prior act of misconduct not resulting in conviction so long as the prosecutor had a good-faith basis for the questions." *Morgan*, 315 N.C. at 634, 340 S.E.2d at 89. That rule provides:

> (b) *Specific instances of conduct.* — Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence [for example, evidence of specific prior or subsequent act, not charged in the indictment, which may be criminal, but as applied herein, does not result in a conviction]. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness . . . .

N.C.G.S. § 8C-1, Rule 608(b). Those types of conduct falling into this category include " 'use of false identity, making false statements on affidavits, applications or government forms (including tax returns), giving false testimony, attempting to corrupt or cheat others, and attempting to deceive or defraud others.' " *Morgan*, 315 N.C. at 635, 340 S.E.2d at 90 (quoting 3 D. Louisell & C. Mueller, *Federal Evidence* § 305 (1979) ). Evidence generally disapproved as irrelevant to the question of a witness' truthfulness includes specific instances of conduct relating to violence against other persons. *Id.*

However, we agree with the State that defendant opened the door to the cross-examination regarding specific instances of misconduct toward both his wife and children. *See, e.g., Hudson*, 331 N.C. at 153-54, 415 S.E.2d at 749. Here, defendant testified on direct examination that he was a loving and supportive husband and father, that he did not intend to hurt his wife but rather unintentionally, or in self-defense, struck back at her with the screwdriver, trying only to get her to stop moving the car. We hold that the State was entitled to cross-examine defendant concerning the specific acts of prior misconduct — including threats, arguments, and acts of violence toward both his wife and children — to explain and rebut defendant's direct examination testimony.

**STATE v. SYRIANI**

[333 N.C. 350 (1993)]

Defendant further contends that, even if the evidence was admissible under Rule 608(b) or 404(b), the trial court erred by failing to exclude it as more prejudicial than probative under Rule 403. We conclude that the trial court did not abuse its discretion in allowing the inquiry into specific instances of misconduct toward both defendant's wife and his children. This assignment of error is overruled.

[10] Defendant next contends that the trial court erred in allowing the prosecution to cross-examine character witnesses Bouhussein and Linn concerning specific acts of misconduct by the defendant, contrary to Rules 404, 403 and 608. Bouhussein testified on redirect examination that defendant was known in the community as a very hard-working, mild-mannered man. Defendant did not have a reputation for violence, indeed, he had a reputation for truthfulness. Linn testified that defendant was not the kind of person he would expect to kill his wife, that defendant and his wife had treated each other with affection, and that there was nothing in defendant's lifestyle that caused him concern. After these witnesses so testified, the prosecutor asked whether they had heard of, or knew about, certain instances of misconduct by defendant toward his wife and children, for example, that defendant had slapped his wife on Easter Sunday, 1989, had chased his wife out of their house in June 1988, and had knocked down and kicked his daughter Rose.

It is well established that a criminal defendant is entitled to introduce evidence of his own good character, but if he "thus 'puts his character in issue,' the State in rebuttal may introduce evidence of his bad character . . . ." *State v. Gappins*, 320 N.C. 64, 69, 357 S.E.2d 654, 658 (1987) (quoting 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 104 (1982 & Cum. Supp. 1986) ). Rule 404 requires that such evidence be of "a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same . . . ." N.C.G.S. § 8C-1, Rule 404(a)(1). Rule 405(a) requires that proof of character or a trait of character be made only by testimony as to reputation or in the form of an opinion, except that upon cross-examination "inquiry is allowable into relevant specific instances of conduct." "[A] witness who has given character evidence for the defendant [may] be cross examined by the State about relevant specific instances of the defendant's conduct." *Gappins*, 320 N.C. at 70, 357 S.E.2d at 658 (expressly noting that prior case law that prohibited use of specific instances of misconduct to test a character witness's knowledge of a defend-

ant's character and reputation is no longer binding); see N.C.G.S. § 8C-1, Rule 405(a).

Defendant put his character in issue by having Bouhussein testify about his reputation for peacefulness, "a pertinent trait of his character." Further, Linn testified that defendant was not the kind of person he would expect to kill his wife and that there was nothing in defendant's lifestyle that caused him any concern. Thereupon, the prosecutor cross-examined each of these witnesses about specific instances of conduct by defendant toward his wife and children, in accordance with Rules 404(a)(1) and 405(a), to rebut their prior testimony. Further, the trial court limited cross-examination to prior acts occurring after Christmas, 1987. Under the aforestated authorities, the trial court did not err in admitting the answers to the prosecutor's questions. This assignment of error is overruled.

[11]  Defendant next contends that the trial court erred in denying his motion to exclude or limit the number of photographs of the victim's body introduced into evidence and in allowing the State to repeatedly pass the photographs to the jury and the jury to view all the photographs again prior to its deliberations at the close of all the evidence. Defendant argues that the photographs were redundant and irrelevant because he disputed neither the victim's identity nor the cause of death and because the facts concerning the number, nature and extent of the wounds to the victim's body were or could have been fully established by competent testimonial or diagrammatical evidence. Defendant further argues that their number, the fact that they were in color, their "physically disgusting" detail, and their repeated publication require a conclusion that the photographs possessed little probative value relative to the great prejudice to defendant their admission caused. We disagree.

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as . . . their excessive or repetitious use is not aimed solely at arousing the passions of the jury." State v. Hennis, 323 N.C. 279, 284, 372 S.E.2d 523, 526 (1988). In order to determine the illustrative value of the photographic evidence and weigh its probative value against its tendency to prejudice the jury, the court must examine both the content and the manner in which the evidence is used and scrutinize the totality of the circumstances composing that presen-

tation. *Id.* at 285, 372 S.E.2d at 527. For example, factors to be considered include what a photograph depicts, the level of detail and scale, whether it is in color or black and white, whether it is a slide or print, the manner of projection or presentation, and the testimony it illustrates. *Id.* Exclusion of photographic evidence under the balancing test of Rule 403 is within the trial court's discretion. *Id.*

Here, the State introduced sixteen color eight-by-ten-inch photographs of the victim's body and one color portrait of the victim taken at an unspecified time before the night of the attack. Of these photographs, six depicted the victim shortly after her arrival at the hospital, intubated, connected to a ventilator, and covered by white hospital sheets. Gory and gruesome, these photographs illustrated the testimony of Boyd Wilson, the neighbor who went to the victim's aid. Wilson also testified that while he did not see the victim at the hospital, intubated and unclothed, he could see the wounds. These six photographs were received with a limiting instruction that they were for the purpose of illustrating Wilson's testimony, if the jury found them so illustrative, and were not substantive evidence. *See, e.g., State v. Thompson*, 328 N.C. 477, 492, 402 S.E.2d 386, 394 (1991) (trial court's cautionary instructions on the use of photographs for illustrative purposes limited the likelihood of unfair prejudice). They served properly to illustrate Wilson's testimony about the nature of the wounds and the prolonged manner of the killing.

Ten photographs were submitted in conjunction with the testimony about the autopsy. Nine of these depicted isolated areas of injury to the hands, arms, elbows, neck, mouth, and head. One depicted a section of the victim's dura, the tough membrane surrounding the brain between the brain and the skull, here with a rectangular hole. Although gruesome, these photographs were not excessive, unduly repetitious, or duplicative of the six hospital photographs because the victim survived almost one month and many of the wounds had healed. Further, these photographs were also tendered with limiting instructions that they were only for the purpose of illustrating Sullivan's testimony. They served to illustrate his testimony regarding the likely weapon, which had never been found, the multiple stab wounds, and the cause of death. *See, e.g., State v. Bearthes*, 329 N.C. 149, 161-62, 405 S.E.2d 170, 176-77 (1991) (twelve autopsy photographs, properly admitted, served to illustrate testimony about manner of the killing, so as to prove

circumstantially elements of first-degree murder, and were tendered with limiting instruction that they were admitted for illustrative purposes, notwithstanding a stipulation as to the cause of death).

Contrary to defendant's assertions that these photographs were repeatedly passed to the jury, the autopsy photographs were passed at the close of Sullivan's testimony and the others at the close of Wilson's testimony. These photographs were published again only at the conclusion of the evidence, with all exhibits. The photographs and the circumstances of their presentation to the jury are not such that we can say their admission for illustrative purposes was not the result of a reasoned decision. We therefore find no abuse of discretion in their admission.

The final photograph to which defendant assigns error is a color portrait of the victim, taken at some unspecified time before the killing, introduced by the State to illustrate the testimony of John Syriani that his mother appeared as depicted. Defendant failed to object to admission of this photograph at trial, as required by N.C. R. App. P. 10(b)(1). This failure constitutes waiver of the right to assert the error on appeal. Reviewed for plain error, or as assumed error, however, there is no possibility that improper admission of this one photograph could have prejudiced defendant. *See* N.C.G.S. § 15A-1443(a) (1988). This assignment of error is overruled.

[12] Defendant next assigns as error the trial court's denial of his motion to dismiss the charge of first-degree murder for insufficiency of the evidence. Defendant concedes that he has reviewed the record and finds sufficient evidence upon which a jury could convict him. Defendant requests that this Court independently review the evidence and decide the issue, citing *Anders v. California*, 386 U.S. 738, 18 L. Ed. 2d 493, *reh'g denied*, 388 U.S. 924, 18 L. Ed. 2d 1377 (1967) (constitutional right to counsel requires that, on an indigent's first appeal from his conviction, court-appointed counsel support the appeal to the best of his or her ability, and if counsel finds the case wholly frivolous, submit a brief referring to anything in the record that might support the appeal).

In *State v. Quick*, we described the appropriate standard of review for determining the sufficiency of the evidence as follows:

"On a motion to dismiss on the ground of insufficiency of the evidence, the question for the court is whether there

STATE v. SYRIANI

[333 N.C. 350 (1993)]

is substantial evidence of each element of the crime charged and of the defendant's perpetration of such crime." *State v. Bates*, 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983).

> [T]he trial court must view the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from it. . . . If there is substantial evidence — whether direct, circumstantial, or both — to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.
>
> *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 382-83 (1988) (citations omitted). Further, "[t]he defendant's evidence, unless favorable to the State, is not to be taken into consideration." *State v. Jones*, 280 N.C. 60, 66, 184 S.E.2d 862, 866 (1971). The determination of the witnesses' credibility is for the jury. *See Locklear*, 322 N.C. at 358, 368 S.E.2d at 383. "[C]ontradictions and discrepancies do not warrant dismissal of the case — they are for the jury to resolve." *State v. Earnhardt*, 307 N.C. 62, 67, 296 S.E.2d 649, 653 (1982).

[*State v. Small*, 328 N.C. 175, 180-81, 400 S.E.2d 413, 415-16 (1991)]. "The trial court's function is to determine whether the evidence will permit *a reasonable inference* that the defendant is guilty of the crimes charged." *State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991) (emphasis in original).

329 N.C. 1, 19, 405 S.E.2d 179, 190 (1991).

Under this standard, there was sufficient evidence that defendant killed his wife with malice, premeditation and deliberation, the only issues defendant disputed at trial. The State's evidence tended to show that defendant had a history of physically abusing his wife and children and that when he first learned that his wife wanted a divorce, he had threatened to kill her and to ruin the lives of the children if she ever left him. Approximately two weeks before he killed his wife, she had obtained a domestic violence order against him, requiring him to leave the house. On the night of 28 July 1990, defendant parked along the street near where his wife and children lived. As his wife's car approached the street, defendant pulled his van in front of her car, forcing her to stop.

Defendant approached the car, opened the door, stabbed her with a screwdriver, and as she moved her car out of the road, continued to stab her. Defendant stabbed her a total of twenty-eight times with a screwdriver, including one blow which penetrated the brain three inches and another that fractured her jaw. Following the assault, defendant walked calmly back to his van and drove to a nearby fire station to have his scratches treated.

This evidence was more than sufficient to allow a reasonable inference that defendant was guilty of murder in the first degree, that is, with malice and premeditation and deliberation. *See, e.g., Quick,* 329 N.C. at 20, 405 S.E.2d at 191 (court may consider, in determining whether sufficient evidence of premeditation and deliberation, want of provocation on part of victim, conduct and statements of defendant before and after the killing, dealing of lethal blows after the victim has been rendered helpless, evidence killing done in brutal manner, and nature and number of the victim's wounds).

In the guilt-innocence phase, we conclude that defendant received a fair trial, free from prejudicial error.

### SENTENCING PHASE ISSUES

The trial court submitted one aggravating circumstance, that the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9) (1988), and two statutory mitigating circumstances, that the defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1) (1988), and that the capital felony was committed while the defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2) (1988). Further, the trial court submitted the eight requested non-statutory mitigating circumstances, as follows: the defendant understands the severity of his conduct; the defendant has demonstrated remorse; the defendant, since his incarceration, has demonstrated an ability to abide by lawful authority; the defendant has a history of good work habits; the defendant has a history of being a good family provider; the defendant has been a person of good character or reputation in the community in which he lived; and any circumstance or circumstances arising from the evidence which the jury finds to have mitigating value.

**[13]** Defendant contends that the trial court committed reversible error in submitting the aggravating circumstance that the murder

of Teresa Syriani was especially heinous, atrocious, or cruel, in that the language of the instructions was too vague to provide any guidance to the jury, contravening both the Eighth and Fourteenth Amendments of the United States Constitution. Defendant relies on *Godfrey v. Georgia* and its progeny. *Godfrey v. Georgia*, 446 U.S. 420, 64 L. Ed. 2d 398 (1980) (Georgia's "outrageously or wantonly vile, horrible or inhuman" circumstance unconstitutionally vague on its face and as applied by the state appellate courts to the facts presented); *see, e.g., Maynard v. Cartwright*, 486 U.S. 356, 100 L. Ed. 2d 372 (1988) (Oklahoma's "especially heinous, atrocious, or cruel" circumstance unconstitutionally vague on its face and as applied).

In the twelve years since *Godfrey*, the United States Supreme Court has approved certain limiting instructions (or subsequent constructions by state appellate courts) as constitutionally sufficient, "provid[ing] *some* guidance to the sentencer." *Walton v. Arizona*, 497 U.S. 639, 654, 111 L. Ed. 2d 511, 529, *reh'g denied*, 497 U.S. 1050, 111 L. Ed. 2d 828 (1990). Approved language includes the phrase "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Proffitt v. Florida*, 428 U.S. 242, 255, 49 L. Ed. 2d 913, 924 (1976); *see also Walton v. Arizona*, 497 U.S. at 654-55, 111 L. Ed. 2d at 529 (approving instruction equating "cruel" with infliction of "mental anguish or physical abuse," or applying "depraved" manner when the perpetrator "relishes the murder, evidencing debasement or perversion" or "shows an indifference to the suffering of the victim and evidences a sense of pleasure"); *Maynard v. Cartwright*, 486 U.S. at 365, 100 L. Ed. 2d at 382 (approving definition limiting "especially heinous, atrocious, or cruel" circumstance to murders involving "some kind of torture or physical abuse"); *cf. Shell v. Mississippi*, 498 U.S. 1, ---, 112 L. Ed. 2d 1, 5 (1990) (Marshall, J., concurring) ("like 'heinous' and 'atrocious' themselves, the phrases 'extremely wicked or shockingly evil' and 'outrageously wicked and vile' could be used by '[a] person of ordinary sensibility [to] fairly characterize almost *every* murder.' ") (quoting *Maynard v. Cartwright*, 486 U.S. at 363, 100 L. Ed. 2d at 381). The Court reasoned that a capital sentencing scheme must "provide a 'meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not.' " *Godfrey*, 446 U.S. at 427, 64 L. Ed. 2d at 406 (quoting *Gregg v. Georgia*, 428 U.S. 153, 188, 49 L. Ed. 2d 859, 883 (1976) ).

This means that if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," . . . . [Otherwise] "a pattern of arbitrary and capricious sentencing like that found unconstitutional in *Furman* could occur."

*Godfrey*, 446 U.S. at 428, 64 L. Ed. 2d at 406 (referring to *Furman v. Georgia*, 408 U.S. 238, 33 L. Ed. 2d 346, *reh'g denied*, 409 U.S. 902, 34 L. Ed. 2d 163 (1972) (citations omitted) ). If the jury instructions on the "especially heinous, atrocious, or cruel" aggravating circumstance are not constitutionally sufficient, *Godfrey* requires that state appellate courts, at the least, "apply the . . . aggravating circumstance within narrow, consistent, and discernible bounds to avoid constitutional infirmity." Richard A. Rosen, *The "Especially Heinous" Aggravating Circumstance in Capital Cases—The Standardless Standard*, 64 N.C. L. Rev. 941, 965 (1986).

In *State v. Goodman*, this Court interpreted our "heinous, atrocious, or cruel" aggravating circumstance as directed at "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State v. Goodman*, 298 N.C. 1, 25, 257 S.E.2d 569, 585 (1979). We have also held that the aggravating circumstance may be found where "the level of brutality involved exceeds that normally present in first-degree murder." *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986) (refers to the phrases disjunctively; finding permissible when brutality exceeds that which is normally present in any killing, or when murder was conscienceless, pitiless, or unnecessarily torturous to the victim), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 574, 364 S.E.2d 373, 375-76 (1988); *cf., e.g., State v. Rook*, 304 N.C. 201, 225, 283 S.E.2d 732, 747 (1981) (approving instructions incorporating both phrases conjunctively, "any brutality which was involved in it must have exceeded that which is normally present in any killing" and "this murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim"), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982); *State v. Fullwood*, 323 N.C. 371,

400, 373 S.E.2d 517, 535 (1988) (same), *sentence vacated*, 494 U.S. 1022, 108 L. Ed. 2d 602 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991). We have also interpreted this aggravating circumstance as appropriate "when the killing demonstrates an unusual depravity of mind on the part of the defendant beyond that normally present in first-degree murder." *Brown*, 315 N.C. at 65, 337 S.E.2d at 827. Killings which are physically agonizing for the victim or which are in some other way dehumanizing, or killings which are less violent but involve the infliction of psychological torture, including placing the victim in agony in his last moments, aware of, but helpless to prevent, impending death, are two more types of murders warranting submission of the circumstance. *Lloyd*, 321 N.C. at 319, 364 S.E.2d at 330. We have also held that the circumstance is properly submitted when there is evidence that the killing involved a prolonged death or was committed in a fashion beyond that necessary to effect the victim's death. *State v. Reese*, 319 N.C. 110, 146, 353 S.E.2d 352, 373 (1987).

Here, the trial court read the North Carolina Pattern Jury Instructions, verbatim, to the jury, as follows:

> Under the evidence in this case, one possible aggravating circumstance may be considered: Was this murder especially heinous, atrocious or cruel?

> In this context, heinous means extremely wicked or shockingly evil; atrocious means outrageously wicked and vile; and cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.

> However, it is not enough that this murder be heinous, atrocious or cruel as those terms have just been defined. This murder must have been especially heinous, atrocious or cruel, and not every murder is especially so.

> For this murder to have been especially heinous, atrocious or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing, or this murder must have been a conscienceless or pitiless crime which was unnecessarily torturous to the victim.

N.C.P.I.—Crim. 150.10, at 18-19 (1992). Because these jury instructions incorporate narrowing definitions adopted by this Court and expressly approved by the United States Supreme Court, or are

IN THE SUPREME COURT

of the tenor of the definitions approved, we reaffirm that these instructions provide constitutionally sufficient guidance to the jury.

[14] Defendant contends, further, that the evidence did not support the existence of this aggravating circumstance, as we have properly and consistently defined it, and that he is, therefore, entitled to have his death sentence vacated and a life sentence imposed or, at a minimum, to a new sentencing hearing. We disagree.

In determining the sufficiency of the evidence to submit an aggravating circumstance to the jury, the trial court must consider the evidence in the light most favorable to the State, with the State entitled to every reasonable inference to be drawn therefrom, and discrepancies and contradictions resolved in favor of the State. *State v. Moose*, 310 N.C. 482, 494, 313 S.E.2d 507, 515-16 (1984). Applying the above limiting constructions, we conclude that the evidence supports a finding that the level of brutality exceeded that normally found in first-degree murder cases and that the killing was physically and psychologically agonizing, conscienceless, pitiless and unnecessarily torturous to Teresa Syriani.

The evidence tends to show that defendant stabbed his victim twenty-eight times. While many of the wounds were to her face and neck, several were to her arms and hands, suggesting that she tried to defend herself or ward off the blows. Further, one wound penetrated her brain three inches, causing hemorrhaging and swelling in the brain. Another blow fractured her jaw and several of her teeth. These blows did not cause immediate death. The victim was able to communicate with her daughter Rose moments after the attack, and, as well, with the attending emergency room assistant upon her arrival at the hospital. Further, a tube was placed through her nose to her lungs to assist her breathing. She died twenty-eight days later as a result of the three-inch puncture wound to her brain, after having suffered stroke, infarct or paralysis. Defendant correctly assesses the record as devoid of expert testimony that his victim suffered "inordinate" pain, but notwithstanding, the jury could reasonably infer from this evidence that the victim sustained and endured agonizing physical pain before becoming unconscious or comatose. Further, this evidence supports a finding that the killing was excessively brutal and conscienceless, pitiless and unnecessarily torturous. *See, e.g., State v. Bonney*, 329 N.C. 61, 80-81, 405 S.E.2d 145, 156 (1991) (evidence of twenty-seven gunshot wounds supported finding of excessive brutality and that the

killing was pitiless and unnecessarily torturous); *Lloyd*, 321 N.C. at 319-20, 364 S.E.2d at 328 (evidence of seventeen stab wounds, several defensive, and that victim survived five to ten minutes, sufficient to support "especially heinous, atrocious, or cruel"); *State v. Huffstetler*, 312 N.C. 92, 115-16, 322 S.E.2d 110, 124-25 (1984) (severity and brutality of numerous blows with cast iron skillet justified submission of aggravating circumstance, notwithstanding that there was no evidence as to whether the victim was alive or conscious during assault), *cert. denied*, 471 U.S. 1009, 85 L. Ed. 2d 169 (1985).

Additionally, the evidence that defendant had abused his wife to the extent that she had left the house with her children; that he had threatened to kill her should she ever leave him; that only two weeks prior to the killing she had an *ex parte* domestic violence order served on defendant, requiring him to leave their home; and that defendant had tried to talk to her or the children, which overtures she had rebuffed, suggests that she feared her husband. The jury could reasonably infer that the victim, upon seeing defendant's van that night, being blocked by the van, observing his getting out and shaking his fist at her, and then attacking her as she tried to reverse the car, suffered and endured psychological torture or anxiety not only for herself but for her young son who was sitting beside her trying to stop his father. *See, e.g., Artis*, 325 N.C. at 319-20, 384 S.E.2d at 493 (finding evidence of psychological suffering where victim killed by manual strangulation rendering her helpless in murderous hands, aware of impending death); *Lloyd*, 321 N.C. at 319, 364 S.E.2d at 328 (killings which are less violent, but involve placing the victim in agony in his or her last moments, aware of, but helpless to prevent, impending death, warrant submission of "especially heinous, atrocious, or cruel" circumstance).

For these reasons, applying constitutionally narrowing definitions heretofore adopted by this Court, we conclude that the evidence and reasonable inferences therefrom support a finding that the murder was "especially heinous, atrocious, or cruel." This assignment of error is overruled.

[15] Defendant next contends that the trial court erred in failing to submit *sua sponte* the mitigating circumstance that defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired. N.C.G.S. § 15A-2000(f)(6) (1988). Defendant argues that the jury could

reasonably have inferred this circumstance from the evidence that defendant was "very emotional and highly upset" when he approached his wife before killing her. We disagree.

Defendant testified during the guilt phase of the trial that he was extremely worried about his family and very upset about the prospect of losing his wife and family through the divorce proceedings. During the sentencing proceeding, defendant testified that he was "very emotional and highly upset" when he approached his wife that night. He further testified that he loved his wife completely and was concerned that he was going to lose his children; that he was worried about his wife and son and that he did not have control in the family; that he was having a lot of hurt inside; and that those feelings were "affecting [his] judgment." He argues that, if the State is to be believed, he was obviously subject to uncontrollable rages, during which he physically assaulted his wife and children, and from which the jury could reasonably infer that he was out of control and unable to conform his conduct to the law on the night of the killing.

It is well settled that "[w]hen evidence is presented in a capital case which may support a statutory mitigating circumstance, the trial court is mandated by the language in 15A-2000(b) to submit that circumstance to the jury for its consideration." *State v. Price*, 331 N.C. 620, 632, 418 S.E.2d 169, 176 (1992) (quoting *Lloyd*, 321 N.C. at 311-12, 364 S.E.2d at 323), *sentence vacated and remanded on other grounds*, --- U.S. ---, 122 L. Ed. 2d 113 (1993). "The test for sufficiency of evidence to support submission of a statutory mitigating circumstance is whether a jury could reasonably find that the circumstance exists based on the evidence." *Id.* The mitigating circumstance in question

> may exist even if a defendant has capacity to know right from wrong, to know that the act he committed was wrong, and to know the nature and quality of that act. It would exist even under these circumstances if the defendant's capacity to appreciate (to fully comprehend or be fully sensible of) the criminality (wrongfulness) of his conduct was impaired (lessened or diminished), or if defendant's capacity to follow the law and refrain from engaging in the illegal conduct was likewise impaired (lessened or diminished).

*State v. Johnson*, 298 N.C. 47, 68, 257 S.E.2d 597, 613 (1979).

## STATE v. SYRIANI

[333 N.C. 350 (1993)]

Defendant notes, correctly, that this Court has never held expert testimony necessary to establish the existence of this mitigating circumstance. However, this circumstance has only been found to be supported in cases where there was evidence, expert or lay, of some mental disorder, disease, or defect, or voluntary intoxication by alcohol or narcotic drugs, to the degree that it affected the defendant's ability to understand and control his actions. See, e.g., Price, 331 N.C. at 632-33, 418 S.E.2d at 176 (psychologist's testimony that defendant suffered from a mental illness that impaired his ability to make judgments, have appropriate mood responses, and be in touch with reality, considered with other evidence of defendant's past psychiatric problems resulting in hospitalization, would support reasonable inference that defendant's capacity to appreciate the criminality of his conduct was impaired); State v. Thomas, 329 N.C. 423, 444-45, 407 S.E.2d 141, 155 (1991) (testimony by defendant and father about defendant's habitual abuse of drugs—including LSD, cocaine, and heroin, that he lived in a "drug house" where people bought and used drugs, that by age twenty he had fathered two children and robbed a fast food restaurant to pay a cocaine debt, and physical evidence corroborating testimony that he had injected heroin the night of the murder, could support a reasonable inference that defendant was under the influence of heroin at the time of the crime and that as a result his ability to appreciate the criminality of his conduct was impaired); State v. Payne, 328 N.C. 377, 408, 402 S.E.2d 582, 600 (1991) (evidence of defendant's substance abuse, including drinking alcohol the night before the murder and smelling like beer shortly after the murder, held sufficient to support submission of mitigating circumstance of impaired capacity to appreciate criminality of conduct); Johnson, 298 N.C. at 68-69, 257 S.E.2d at 613-14 (jury could find existence of circumstance from testimony that defendant suffered from latent schizophrenia and that his capacity to appreciate the criminality of his conduct was impaired).

Defendant's testimony that his judgment was affected by his emotional disturbance, standing alone, would not support a reasonable inference that defendant's capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was impaired, lessened or diminished. We thus find no error in the failure to submit this mitigating circumstance; this assignment of error is therefore overruled.

[16]   Defendant next contends that the trial court committed plain error in failing to provide the jury with a limiting instruction at the penalty phase that the prior bad acts evidence received at the guilt phase, as well as on rebuttal in the penalty phase, could not be used by the jury to support an aggravating circumstance in the penalty phase. Defendant concedes that the evidence may have been relevant to rebut the defendant's statutory mitigating circumstance of lack of criminal history, but argues it was wholly irrelevant for the jury to believe it could consider such evidence in support of the aggravating circumstance submitted to it, *viz*, that the killing was "especially heinous, atrocious, or cruel."

The trial court stated only that the jury could consider all of the evidence admitted during both guilt and sentencing phases, which instruction was authorized by statute. *See* N.C.G.S. § 15A-2000(a)(3) ("In the [sentencing] proceeding there shall not be any requirement to resubmit evidence presented during the guilt determination phase of the case, unless a new jury is empaneled, but all such evidence is competent for the jury's consideration in passing on punishment."). The court carefully instructed the jury that under the evidence in the case only one possible aggravating circumstance could be considered—whether the murder was especially heinous, atrocious, or cruel—and then proceeded to properly instruct the jury on that circumstance in accord with the North Carolina Pattern Jury Instructions. The court specifically referred to the prior bad acts evidence with regard to the jury's consideration of whether defendant had no significant history of prior criminal activity: "You would find this mitigating circumstance if you find that there were incidences of assault against the family, and that this is not a significant history of prior criminal activity." The evidence was also relevant to the submitted mitigating circumstance that defendant has a good character because defendant proffered evidence of his non-violent character. Further, the evidence of bad acts toward the victim is relevant to the existence of the "heinous, atrocious, or cruel" aggravating circumstance because it tended to show the victim feared her husband and endured psychological torment during the attack, not only on account of the danger to her own life but also that to the life of her son, who tried to stop his father's attack.

We conclude that the evidence was relevant and that the court's instructions were proper under statutory authority. We thus hold that the court did not err in failing to submit the special instruc-

tions that even defense counsel at trial did not consider necessary. This assignment of error is overruled.

[17] Defendant next takes exception to the prosecutor's argument: "He's killed now. The only way to insure he won't kill again is the death penalty." Defendant contends that the prosecutor appealed to the jury to recommend the death penalty as a deterrent to his killing again. Defendant concedes that he failed to object at trial but contends that the trial court committed plain error in failing to act *ex mero motu* to instruct the jury to disregard the argument. We disagree.

In *State v. Zuniga*, we distinguished arguments invoking general deterrence and held specific deterrence arguments proper. 320 N.C. 233, 268-69, 357 S.E.2d 898, 920-21 (1987) (specific deterrence argument, "Justice is making sure that [defendant] is not ever going to do this again," not improper), *cert. denied*, 484 U.S. 959, 98 L. Ed. 2d 384 (1987); *cf. State v. Kirkley*, 308 N.C. 196, 215, 302 S.E.2d 144, 155 (1983) (general deterrence argument, "I'm asking you to impose the death penalty as a deterrent, to set a standard of conduct," improper but not so grossly so as to require trial court to intervene *ex mero motu*), *overruled on other grounds by State v. Shank*, 322 N.C. 243, 251, 367 S.E.2d 639, 644 (1988). This argument is without merit.

[18] Within this same assignment of error, defendant further contends that the trial court committed plain error in failing to act *ex mero motu* in instructing the jury to disregard the following statement by the prosecution:

Rose Syriani, as he started out, started to run up the street screaming and ran to her mother. Screaming. And what did her mother say? This kind, sweet, loving mother, what did she say? "Mama, shut up." Why in the world would a woman like that, knowing what kind of woman she was, say to Rose "shut up"? I'll tell you why. She had heard the defendant say he was going to kill her, going to kill all her daughters. She didn't want the defendant to hear Rose out there because she knew if he did he would kill her too.

Why did he stop at the corner? Why did he start back? I submit to you he looked in his rear view mirror and he saw probably the person he hated second only to Teresa running up the street behind him screaming. "I'll fix her too." Stopped

STATE v. SYRIANI

[333 N.C. 350 (1993)]

the van, got out, weapon in hand, and started back. But for a good citizen who was willing to put himself in harm's way between Rose and the Defendant, we would be trying a triple murder here today.

Prosecutors are given wide latitude in the scope of their argument. *Zuniga*, 320 N.C. at 253, 357 S.E.2d at 920. "A prosecutor's argument is not improper where it is consistent with the record and does not travel into the fields of conjecture or personal opinion." *Id.* Counsel are entitled to argue to the jury all the law and facts in evidence and all reasonable inferences that may be drawn therefrom, but may not place before the jury incompetent and prejudicial matters and may not travel outside the record by interjecting facts of their own knowledge or other facts not included in the evidence. *State v. McNeill*, 324 N.C. 33, 48, 375 S.E.2d 909, 918 (1989), *sentence vacated*, 494 U.S. 1050, 108 L. Ed. 2d 756, *on remand*, 327 N.C. 388, 395 S.E.2d 106 (1990), *cert. denied*, --- U.S. ---, 113 L. Ed. 2d 459 (1991). In capital cases, when no objection is made at trial to the prosecutor's argument, that argument is subject to limited appellate review for gross improprieties which make it plain that the trial court abused its discretion in failing to correct the prejudicial matters *ex mero motu. State v. Pinch*, 306 N.C. 1, 17, 292 S.E.2d 203, 218 (1982), *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622, *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled on other grounds by State v. Benson*, 323 N.C. 318, 326, 372 S.E.2d 517, 521 (1988).

The evidence tends to show that defendant abused his wife and children, including his daughter Rose. Only a few weeks prior to killing his wife, defendant threatened to kill her and to ruin the lives of the children. Approximately two weeks before her murder, the victim obtained a civil domestic violence order against defendant requiring him to leave the house. Further, as she lay on the front seat of her car following the attack, her daughter Rose came up to the car, screaming. Her mother told her to shut up.

The evidence also shows that at about the time Rose went to her mother, defendant started to walk back toward the car. As a neighbor went up to the car to see what was happening, defendant turned around and walked back to his van.

We conclude that the prosecutor did not travel outside the record. His arguments, although touching upon facts not testified to, were reasonable inferences based on the evidence and were

within the wide latitude properly given counsel in argument. Assuming error, *arguendo*, any impropriety in the argument was not so gross as to require the trial court to intervene *ex mero motu*. This assignment of error is overruled.

We conclude that defendant received a fair sentencing hearing, free from prejudicial error.

## PRESERVATION ISSUES

Defendant raises eight additional issues which he concedes have been recently decided against him by this Court: (1) the trial court erred in denying defendant's motion to permit voir dire examination of potential jurors regarding their conceptions of parole eligibility; (2) the trial court erred in failing to require the prosecution to disclose, pre-trial, the aggravating circumstances on which the State intended to rely and any evidence tending to negate or establish such factors; (3) death qualification of the jury and denial of defendant's motion for separate juries and individual voir dire violated defendant's constitutional rights to an impartial jury, due process of law, and reliability in the imposition of the death penalty; (4) the trial court erred by permitting the prosecutor to use peremptory challenges to excuse qualified jurors on account of their opposition or lack of enthusiasm concerning the death penalty; (5) the North Carolina death penalty statute, and consequently the death sentence in this case, is unconstitutional, was applied in a discriminatory manner, is vague and overbroad, and involves subjective discretion; (6) the trial court erred by instructing the jury that defendant bore the burden of proving mitigating circumstances to the satisfaction of the jury; (7) the trial court's instructions placing defendant in jeopardy of his life if the jury determined that the mitigation was insufficient to outweigh the aggravation violate defendant's constitutional right to due process of law and to be free from cruel and unusual punishment; and (8) the trial court's instructions that the jury had a duty to return a recommendation of death if it found the aggravating circumstance, in light of the mitigating circumstances, sufficiently substantial to call for the death penalty violated defendant's constitutional right to due process of law and to be free from cruel and unusual punishment.

We have considered defendant's arguments on these issues, and we find no compelling reason to depart from our prior holdings. These assignments of error are overruled.

PROPORTIONALITY REVIEW

Having found no error in the guilt and sentencing phases, we are required by statute to review the record and determine (1) whether the record supports the jury's finding of the aggravating circumstance upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2) (1988); *State v. Robbins*, 319 N.C. 465, 526, 356 S.E.2d 279, 315 (1987), *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987).

We have held that the record supports the jury's finding of the single aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." N.C.G.S. § 15A-2000(e)(9). We further conclude that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. We thus turn to our final statutory duty of proportionality review.

[19]   In conducting proportionality review, we "determine whether the death sentence in this case is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant." *Brown*, 315 N.C. at 70, 337 S.E.2d at 829. We compare similar cases in a pool consisting of

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). This pool includes only those cases found to be free of error in both phases of the trial. *State v. Jackson*, 309 N.C. 26, 45, 305 S.E.2d 703, 717 (1983). We do not, however, "necessarily feel bound . . . to give a citation to every case in the pool of 'similar cases' used for comparison." *Williams*, 308 N.C. at 81, 301 S.E.2d at 356. Rather, we limit our consideration to

those cases "which are roughly similar with regard to the crime and the defendant . . . ." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985).

> If, after making such a comparison, we find that juries have consistently been returning death sentences in the similar cases, then we will have a strong basis for concluding that a death sentence in the case under review is not excessive or disproportionate. On the other hand if we find that juries have consistently been returning life sentences in the similar cases, we will have a strong basis for concluding that a death sentence in the case under review is excessive or disproportionate.

*Id.*

Characteristics distinguishing the present case include (1) a murder of a wife preceded by many years of physical abuse and threats to her; (2) fear on the part of the victim; (3) a calculated plan of attack by the defendant; (4) a senseless and brutal stabbing in front of other people, found to be "especially heinous, atrocious, or cruel" by the jury; (5) a period of time in which the victim suffered great physical and psychological pain before death; and (6) a distinct failure by the defendant to exhibit remorse after the killing. The jury found only one statutory mitigating circumstance, that the crime was committed while the defendant was under the influence of mental or emotional disturbance. It found five non-statutory mitigating circumstances: that defendant understands the severity of his conduct; that he has, since his incarceration, demonstrated an ability to abide by lawful authority; that he has a history of good work habits; that he has a history of being a good family provider; and that he has been a person of good character or reputation in the community in which he lived. It found two circumstances under the catchall: that the defendant was raised in a different culture and that he was aggravated by events following the issuance of the *ex parte* domestic violence order.

Of the cases in which this Court has found the death penalty disproportionate, only two involved the "especially heinous, atrocious, or cruel" aggravating circumstance. *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983). Neither is similar to this case.

STATE v. SYRIANI

[333 N.C. 350 (1993)]

In *Stokes*, the defendant and several others planned to rob the victim's place of business. During the robbery one of the assailants severely beat the victim about the head, killing him. *Stokes*, 319 N.C. at 3, 352 S.E.2d at 654. We find the dissimilarities between *Stokes* and this case significant. First, the defendant in *Stokes* was seventeen-years-old; defendant in this case is fifty-two-years-old. Second, the defendant in *Stokes* was convicted on a felony murder theory. There was virtually no evidence of premeditation and deliberation. In the present case, defendant was convicted on a theory of premeditation and deliberation, and there was substantial evidence of both premeditation and deliberation. There was also no evidence in *Stokes* showing who was the ringleader in the robbery, or that the defendant deserved a death sentence any more than did an older confederate who received a life sentence.

In *Bondurant*, the defendant shot the victim while they were riding together in a car. *Bondurant*, 309 N.C. at 677, 309 S.E.2d at 173. The Court "deem[ed] it important in amelioration of defendant's senseless act that immediately after he shot the victim, he exhibited a concern for [the victim's] life and remorse for his action by directing the driver of the automobile to the hospital." *Id.* at 694, 309 S.E.2d at 182. He then went inside to secure medical treatment for the victim. The defendant also spoke with the police at the hospital, confessing that he shot the victim. In the present case, by contrast, the defendant offered neither comfort nor help to his wife, nor did he attempt to secure help from others. As his son returned to his mother, after running off to seek help, defendant yelled at him in Arabic, "Bastard." Then defendant left the scene and drove to a nearby fire station, where he told a fireman that he needed medical attention because he had been in a fight. His later expressions of remorse at the trial are not comparable to the actions taken by the defendant in *Bondurant*.

There are three similar cases in the pool in which the jury recommended a sentence of death after finding as an aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *State v. Spruill*, 320 N.C. 688, 360 S.E.2d 667 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 934 (1988); *Huffstetler*, 312 N.C. 92, 322 S.E.2d 110; *State v. Martin*, 303 N.C. 246, 278 S.E.2d 214, *cert. denied*, 454 U.S. 933, 70 L. Ed. 2d 240, *reh'g denied*, 454 U.S. 1117, 70 L. Ed. 2d 655 (1981). Further, we believe that another case—*State v. Boyd*, 311 N.C. 408, 319 S.E.2d 189

(1984), *cert. denied,* 471 U.S. 1030, 85 L. Ed. 2d 324 (1985)—is similar, and comparison to the present case is warranted.

In *Huffstetler,* defendant beat his mother-in-law to death with a cast iron skillet after an argument. The victim had multiple wounds on her head, neck and shoulders. Her jaw, neck, spine and collarbone were fractured. After beating the victim, the defendant went home to change his bloody clothes, returned to the scene to remove the skillet, and went to visit a woman friend. *Huffstetler,* 312 N.C. at 98-100, 322 S.E.2d at 115-16. The jury in *Huffstetler* found as the single aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *Id.* at 100, 322 S.E.2d at 116. The jury also found three mitigating circumstances: that the defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired; that the killing occurred contemporaneously with an argument and by means of an instrument acquired at the scene and not taken there; and that the defendant did not have a history of violent conduct. *Id.* Notwithstanding the fact that defendant suffered from an emotional or mental disorder, this Court concluded that the sentence of death was not disproportionate, based on evidence similar to that in the present case, including the brutal nature of the killing, the lack of remorse shown by the defendant, and the defendant's cool actions after the murder.

In *Martin,* the defendant followed his wife to a neighbor's apartment and fired two shots at her. She slumped to the floor, unable to escape. The defendant proceeded to pistol whip her and taunt her for almost twenty-five more minutes, fired a round at her in the presence of their young child, and then fired several more rounds, killing her. *Martin,* 303 N.C. at 248, 278 S.E.2d at 216. The jury found as the single aggravating circumstance that the murder was especially heinous, atrocious, or cruel. *Id.* As in the present case, the murder was preceded by threats against the victim, the crime involved great physical and psychological pain and suffering, the murder was not done in a quick and efficient manner, and the victim was murdered in a public place in view of her child and neighbor. There, too, the defendant suffered from a mental or emotional disturbance. This Court found the sentence of death not disproportionate, emphasizing the prior threats and the brutal manner in which death was inflicted. *Id.* at 256, 278 S.E.2d at 220-21.

In *Spruill*, the defendant was convicted of killing a former girlfriend. He followed her around a nightclub and then out into the parking lot as she left. She apparently was frightened. He jumped into her car and stabbed her. Friends pulled him out of the car, but he eluded their grasp and returned to his victim, cutting her throat. She strangled on her own blood. *Spruill*, 320 N.C. at 690-92, 360 S.E.2d at 668-69. The jury found as the single aggravating circumstance that the murder was especially heinous, atrocious, or cruel, but found none of the five submitted mitigating circumstances. *Id.* at 701, 360 S.E.2d at 674. This Court upheld the sentence of death.

In *Boyd*, the defendant was convicted of killing his estranged girlfriend. Defendant threatened the victim several times after following her to a shopping center. As she tried to leave, he pulled out a knife and stabbed her repeatedly in front of her mother and her daughter. The victim suffered considerably before her death. *Boyd*, 311 N.C. at 412-13, 319 S.E.2d at 194. The jury found as aggravating circumstances that the murder was especially heinous, atrocious, or cruel and that the defendant previously had been convicted of a felony involving the use or threat of violence to the person. *Id.* at 415-16, 319 S.E.2d at 195-96. The jury found one or more unspecified mitigating circumstances of the sixteen circumstances submitted. *Id.* at 416-17, 319 S.E.2d at 195-96. In upholding the sentence of death, this Court emphasized the overwhelming evidence of guilt, the prior threats, and the premeditated brutality of the murder, including the suffering of the victim.

Defendant relies on four cases in which the jury recommended life sentences as being similar to this case. *State v. Madric*, 328 N.C. 223, 400 S.E.2d 31 (1991); *State v. Harold*, 312 N.C. 787, 325 S.E.2d 219 (1985); *State v. King*, 311 N.C. 603, 320 S.E.2d 1 (1984); *State v. Myers*, 299 N.C. 671, 263 S.E.2d 768 (1980).

In *Harold, King* and *Myers*, the killings were by gunshot, and there was not the evidence of excessive brutality or suffering that there is in the present case. In *Harold*, the defendant entered the house through an unlocked window and chased the victim, his former girlfriend, through the house and out into a neighboring yard. The defendant caught the victim and threw her to the ground, then stood over her and shot her at point blank range as she begged for her life. *Harold*, 312 N.C. at 789, 325 S.E.2d at 220-21. There was evidence, however, that defendant suffered from paranoid

schizophrenia. *Id.* at 790, 325 S.E.2d at 221. In *King*, the defendant shot his former girlfriend with a pistol and again with a rifle. There was evidence of an argument about a truck purchased by the defendant but registered in the victim's name, and apparently no evidence that the victim feared the defendant. *King*, 311 N.C. at 605-07, 320 S.E.2d at 3-4. In *Myers*, there was evidence that the defendant had physically and verbally abused his wife, speaking to her sometimes as if she were a child and pulling her hair or ordering her to bed without her clothes. Further, there was evidence that the defendant had threatened the victim and that she feared him. *Myers*, 299 N.C. at 674-76, 263 S.E.2d at 770-72. On the day of the killing, the defendant accosted his wife and forced her to drive while he held a gun to her head. The victim pushed the gun away, but the defendant regained control of the gun and fired, killing her with that shot. *Id.* at 678, 263 S.E.2d at 773.

In *Madric*, the defendant was convicted of stabbing a pregnant mother to death and dragging her body out of her car and into the woods beside defendant's driveway. *Madric*, 328 N.C. at 225, 400 S.E.2d at 33. However, the murder was not planned but was committed while the defendant was committing robbery and kidnapping. Further, the victim was a stranger to the defendant. The murder was not in public or in front of family or friends, and there was no evidence of prior threats to the victim or history of violence by the defendant toward the victim. These circumstances distinguish these cases from the present case.

There is another case that is facially similar to the present case, *State v. Bearthes*, 329 N.C. 149, 405 S.E.2d 170, in which the jury recommended a life sentence. In *Bearthes*, the defendant stabbed his estranged wife through the open window of her car in front of at least four witnesses and two of their children. The victim suffered thirty-four wounds, twenty-three of which were life threatening, and died soon after the attack. *Bearthes*, 329 N.C. at 152-53, 162, 405 S.E.2d at 171-72, 177. The record shows that the jury found the single aggravating circumstance that the murder was "especially heinous, atrocious, or cruel." It found two statutory mitigating circumstances: that the defendant had no significant history of prior criminal activity, and that the capital felony was committed while the defendant was under the influence of mental or emotional disturbance. It also found five non-statutory mitigating circumstances: that the defendant was seeking marriage and religious counseling at the time of the offense; that his conduct in jail be-

STATE v. SYRIANI

[333 N.C. 350 (1993)]

tween the offense date and the sentencing date had been exemplary; that he voluntarily surrendered himself at the sheriff's department and thereafter voluntarily confessed both orally and in writing to his involvement in the offense; that he had exhibited religious beliefs before his incarceration; and that he had been a good neighbor. We find the dissimilarities between *Bearthes* and this case significant, however. In *Bearthes*, the defendant had not physically or verbally abused his wife or threatened her directly. There was no evidence that the attack was anything but unexpected by the victim. She had just rolled down her window to give the defendant directions to an outing. Finally, there was evidence that the victim died within five minutes of the attack, that the defendant was in shock and could not remember the attack and, seeing blood on his hands, asked his son to drive him to the sheriff's department. The defendant "asked [the deputies] about his wife because he was concerned she might be hurt." *Id.* at 154, 405 S.E.2d at 173. These facts distinguish *Bearthes* from the present case.

We find that *Huffstetler, Martin, Spruill* and *Boyd* are the cases in the pool most comparable to this case. In light of these cases, we cannot say that the death sentence in this case was excessive or disproportionate, considering both the crime and the defendant.

We hold that the defendant received a fair trial and sentencing hearing, free of prejudicial error. In comparing this case to similar cases in which the death penalty was imposed, and in considering both the crime and the defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive. *Robbins*, 319 N.C. at 529, 356 S.E.2d at 317.

NO ERROR.

Justice PARKER did not participate in the consideration or decision of this case.